# EXHIBIT A

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
| --- | --- | --- |

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>Macomb County    JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS | CASE NO.<br>22-002172 -CB |
| --- | --- | --- |

| Court address<br>40 North Main St., Mount Clemens, MI 48043 | Court telephone no.<br>586-469-7171 |
| --- | --- |

| Plaintiff's name(s), address(es), and telephone no(s).<br>Blue Cross Blue Shield of Michigan<br>600 E Lafayette Blvd<br>Detroit, MI 48226 | v | Defendant's name(s), address(es), and telephone no(s).<br>Corizon Health Incorporated<br>c/o The Corporation Company<br>40600 Ann Arbor Road E Suite 201<br>Plymouth, MI 48170 |
| --- | --- | --- |

Plaintiff's attorney, bar no., address, and telephone no.
Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
One Woodward Avenue, Suite 2400 Detroit, MI 48226
313-965-7848

Instructions: Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer   pending.

Summons section completed by court clerk.    | SUMMONS |

NOTICE TO THE DEFENDANT: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>JUN 1 4 2022 | Expiration date*<br>SEP 1 3 2022 | Court clerk<br>ANTHONY G. FORLINI |
| --- | --- | --- |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (9/19) **SUMMONS**                    MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

| | SUMMONS |
|---|---|
| **PROOF OF SERVICE** | Case No. 22- ꝏ২\৭২ -CB |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Fee | | Signature |
|---|---|---|---|---|
| $ | | $ | | |
| Incorrect address fee | Miles traveled | Fee | TOTAL FEE | Name (type or print) |
| $ | | $ | $ | |
| | | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
Date

My commission expires: _____ Signature: _____
Date                                              Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____
Signature

STATE OF MICHIGAN

IN THE MACOMB COUNTY CIRCUIT COURT

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

      Plaintiff,

v

CORIZON HEALTH INCORPORATED,

      Defendant.

_____/

Case No.: 2022- OO2172 -CB

**RICHARD L. CARETTI**

Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
Attorneys for Plaintiff
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
(313) 965-7848
gabe.sybesma@kitch.com
paul.wilk@kitch.com

_____/

**RECEIVED**

.  JUN 1 4 2022

ANTHONY G. FORLINI
Macomb County Clerk

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Ave, H-4,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

## COMPLAINT

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge. MCR 2.113(C)(2)(b).

(P83691)

This Case meets the statutory requirements to be assigned to the Business Court pursuant to MCL 600.8031(C) and MCL 600.8035.

(P83691)

NOW COMES BLUE CROSS BLUE SHIELD OF MICHIGAN ("Plaintiff") and for its Complaint against Defendant CORIZON HEALTH INCORPORATED ("Defendant") states as follows:

## GENERAL ALLEGATIONS

1. Plaintiff Blue Cross Blue Shield of Michigan ("BCBSM") is a nonprofit mutual insurance company headquartered at 600 East Lafayette Boulevard, Detroit, Michigan 48226.

2. Defendant, Corizon Health Incorporated, is a prison healthcare contractor in the United States that provides services nationwide.

3. Defendant, Corizon Health Incorporated, has an office in Lansing, Michigan and contracted with the State of Michigan to provide healthcare services at over 30 facilities across the State.

4. Specifically, Corizon Health Incorporated provided healthcare services at the Michigan Department of Corrections facility located in Macomb County, Michigan.

5. Therefore, Defendant conducted business in Macomb County Michigan and Venue is proper pursuant to MCL 600.1621.

6. This Court has jurisdiction over this matter as the amount in controversy exceeds $25,000.00.

## FACTUAL BACKGROUND

7. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.



Klich Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Ave., Suite
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

2

8. In December of 2015, Plaintiff and Defendant signed an administrative services contract ("The Contract"), in which Plaintiff processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Defendant.[1]

9. Both parties performed under this contract until September of 2021.

10. On September 29, 2021, Defendant terminated The Contract.

11. However, pursuant to the terms of The Contract, Defendant is responsible for reimbursing Plaintiff for all claims incurred prior to September 29, 2021, which is the date the termination became effective.

12. Plaintiff sent an Invoice to Defendant detailing the amount owed, which totals $3,410,136.51.[2]

13. As of early 2022, Defendant had yet to make any payments towards the amount owed.

14. Plaintiff mailed a demand letter to Defendant in March of 2022 detailing the amount due and owing.[3]

15. Defendant did not respond to this letter and did not object to the amount owed.

16. As of the date of this Complaint, Defendant has not made any payment towards the overdue balance.

17. Defendant is in breach of the contract it entered into with Plaintiff and currently owes Plaintiff $3,410,136.51, in addition to interest, costs, and attorney fees, as a result of said breach.



Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

[1] Exhibit A- Contract
[2] Exhibit B- Invoice
[3] Exhibit C- Demand Letter

3

## COUNT I: BREACH OF CONTRACT

18. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.

19. A valid and enforceable contract exists between Plaintiff and Defendant, created in December of 2015.[4] This contract was renewed yearly, most recently in December of 2020.[5]

20. Plaintiff complied with all of its obligations under The Contract by processing medical claims submitted by Corizon on behalf of incarcerated individuals.

21. Defendant breached The Contract by failing to make payments for all claims processed prior to September 29, 2021, which was the date that Defendant terminated The Contract.

22. The breach by Defendant has caused damages to Plaintiff in the amount of $3,410,136.51, as well as interest, costs, and attorney fees.

WHEREFORE, Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court enter judgment in its favor and against Defendant, in addition to pre-suit and pre-judgment interest, costs, and attorneys' fees.

## COUNT II: ACCOUNT STATED

23. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.



(313) 965-7900

[4] Ex. A
[5] Exhibit D- Group Signature Page

4

24. Defendant entered into a valid and enforceable contract promising to reimburse in return for Plaintiff processing medical claims for incarcerated individuals at Michigan correctional facilities serviced by Defendant.

25. Plaintiff sent Defendant statements outlining the claims processed by Plaintiff and the amount owed to Plaintiff by Defendant.[6]

26. Defendant received the demand letter and never objected to the stated amount owed.

27. Defendant has not paid the balance owed on the account, despite Plaintiff's demand for payment.

28. Defendant is justly indebted to Plaintiff in the amount of $3,410,136.51 plus interest, costs, and attorneys' fees.

29. An Affidavit verifying the balance due on the account is attached as **Exhibit E**.

WHEREFORE, Plaintiff Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court enter judgment in its favor and against Defendant, in addition to pre-suit and pre-judgment interest, costs, and attorneys' fees.

## COUNT III: QUANTUM MERUIT

30. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.

31. Plaintiff processed medical claims submitted by Defendant based upon Defendant's promise to pay Plaintiff the agreed-upon amount.

32. Defendant received benefits from the work performed by Plaintiff.



Kitch Drutchas
Wagner Valitutti &
Sherbrook
Attorneys and
Counselors
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

---

[6] Ex. C

5

DET02:2554611.1

33. As a result of Defendant's failure and refusal to pay the agreed-upon amount, Defendant has been unjustly enriched.

34. As a result of Defendant's failure and refusal to pay the agreed-upon amount, Plaintiff has sustained damages of at least $3,410,136.51, plus interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court enter judgment in its favor and against Defendant, in addition to pre-suit and pre-judgment interest, costs, and attorneys' fees.

Respectfully submitted,

KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

By: _____

Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
Attorneys for Plaintiff
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
(313) 965-7848

Dated: June 14, 2022



Kitch Drutchas
Wagner Valitutti &
Sherbrook
Attorneys at Law
One Woodward Avenue
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

6



**RECEIVED**

JUN 1 4 2022

ANTHONY G. FORLINI
Macomb County Clerk

---

**Administrative Services Contract –Weekly Invoiced Program**

**Corizon**

---

This Contract commences on __December 1, 2015__ (the "Effective Date") and is made between Blue Cross Blue Shield of Michigan, a Michigan non-profit mutual insurance corporation, with offices at 600 Lafayette East, Detroit, Michigan 48226-2998 ("BCBSM") and _____ Corizon _____ with offices at _105 Westpark Drive Suite 200, Brentwood,TN 37027_ ("Group"), as the plan sponsor and administrator of its group health care plan ("Plan").

BCBSM and Group have agreed that BCBSM shall administer Claims processing for the Plan. This Contract sets forth the administrative responsibilities of BCBSM and Group's financial and other obligations with respect to BCBSM's role as a service provider to the Plan.

By entering into this Contract, Group and BCBSM hereby agree that, to the extent the Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), their relationship is that of Group as "Plan Fiduciary" and BCBSM as "Service Provider" as those terms are used in Department of Labor guidance including 29 C.F.R. §2550.408b-2.

BCBSM and Group agree as follows:

## ARTICLE I
## DEFINITIONS

A. "Amounts Billed" means the amount that Group shall reimburse and pay BCBSM for Claims which have been processed and paid by BCBSM or another BCBS Plan under the terms of this Contract, Pharmacy Benefits if applicable, the Administrative Fee set forth in Schedule A, any Additional Administrative Compensation ("AAC") as set forth in Schedule A, Michigan Claims Tax, Pharmacy benefit fees as set forth in Schedule A, Health Care Provider Interest, and other fees and charges as set forth in Schedules A and B.

B. "BCBS Plan" means a company that has been licensed by BCBSA other than BCBSM.

C. "BCBSA" means the Blue Cross and Blue Shield Association.

D. "BlueCard Program" means the national program established by BCBSA under which Enrollee Claims are processed by BCBS Plans when Enrollees receive health care services outside of the geographic area that BCBSM serves. BCBSA mandates the policies, procedures and disclosures of the BlueCard Program and amends them from time to time. Schedule B sets forth BCBSA's required disclosures for the BlueCard Program and is incorporated into this Contract. If BCBSA amends the disclosures, such amendments shall automatically become a part of this Contract upon BCBSM giving 60 days prior written notice to Group.

E. "Claim" means a request for payment from a health care provider for a health care service provided to an Enrollee, with an incurred date for the service during the term of this Contract. Claims billed to Group include all amounts that BCBSM reimburses health care providers including both service-based and value-based reimbursement. BCBSM negotiates provider reimbursement rates on its own behalf and may set the rate for health care services to cover any BCBSM obligation to health care providers. BCBSM does not retain any portion of Claims as compensation. Provider reimbursement is governed by separate agreements with providers, BCBSM standard operating procedures for Claims, and BCBSM Quality Programs.

Claims received from an out-of-state BCBS Plan for a health care service provided to an Enrollee out-of-state are paid according to that BCBS Plan's health provider contracts and processed according to BlueCard Program standard operating procedures. Pursuant to the BlueCard Program, as described in Schedule B, out-of-state Claims may include a BlueCard Access Fee for processing the claim. Out-

1

ASC Weekly Invoiced Program – CID# 279476

of-state Claims are reported and billed to the Group as they are received by BCBSM from the out-of-state BCBS Plan.

F.  "Contract" means this Administrative Services Contract – Weekly Invoiced Program, as may be amended from time to time, and any Schedules, Parts, Exhibits and Addenda attached hereto and incorporated herein by reference.

G.  "Contract Year" means the period from the Effective Date to the first Renewal Date, or the period from one Renewal Date to the next Renewal Date. If termination occurs other than at the end of a Contract Year, Contract Year means that period from the Effective Date or the most recent Renewal Date through the date of termination.

H.  "Coverages" means the health care benefits set forth in Universal Group Application or Part C of the Group Enrollment and Coverage Agreement, which is incorporated into this Contract.

I.  "Employee" means the following which are eligible and enrolled for Coverage under the terms of the Plan or as required by law: (i) employees as designated by Group; (ii) retirees and their surviving spouses as designated by the Group; and (iii) COBRA beneficiaries.

J.  "Enrollee" means an individual that Group enrolled as an employee, spouse or dependent in the Plan pursuant to Article II.B, either as an Employee or as a dependent of an Employee.

K.  "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 USC 1101, *et seq*, and regulations promulgated thereunder.

L.  "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended, Public Law 104-191 of 1996, *et seq*, and regulations promulgated thereunder.

M.  "IBNR Claims" means Claims which are incurred during the term of this Contract, including during the Transition Assistance Period, but have not been reported to the Group as Amounts Billed or paid and which remain the Group's liability.

N.  "PPACA" means the Patient Protection and Affordable Care Act, as amended, Public Law 111-148 of 2010, *et seq*, and regulations promulgated thereunder.

O.  "Quality Programs" refer to BCBSM programs funded with value-based provider reimbursement. Quality Programs are governed by separate agreements with health care providers and are designed to improve health care outcomes and control health care costs.

P.  "Renewal Date" means the date one year after the Effective Date, and the same date of every subsequent year. The Renewal Date may be changed by mutual agreement of BCBSM and Group.

Q.  "Transition Assistance Period (TAP)" means a period of twenty-four (24) months after Termination has been effectively demanded under Article IV, during which BCBSM shall provide those services, and Group shall perform those obligations, set forth in Article IV, Section B.

## ARTICLE II
## GENERAL RESPONSIBILITIES

A.  Claims Administrator Status.

If the Plan is governed by ERISA, based on Group's disclosure of ERISA status in this Contract, Group hereby delegates to BCBSM the responsibility and discretionary authority as claims administrator to makes final benefit determinations and plan interpretations necessary to make those benefit determinations. BCBSM's claims administrator responsibilities extend only to the full and fair review of claims and administrative appeals as set forth in ERISA §433. By assuming these specifically delegated responsibilities as claims administrator, BCBSM does not thereby assume any other duty of the Group as Plan Administrator or any other fiduciary function Group performs on behalf of its Plan. Any determination or interpretation made by BCBSM pursuant to its claim determination authority is

2

ASC Weekly Invoiced Program – CID# 279476

binding on the Enrollee, Group, and BCBSM unless it is demonstrated that the determination or interpretation was arbitrary and capricious. Group retains all other fiduciary responsibilities and duties under ERISA not specifically delegated to BCBSM in this Contract.

BCBSM shall not be responsible for Group's failure to meet any of its financial obligations or Plan Administrator responsibilities with respect to the Plan.

B.      Eligibility and Enrollment.

Prior to the Effective Date, Group shall notify BCBSM of all Enrollees that will be covered by the Plan. During the term of this Contract, following agreed upon procedures, Group shall notify BCBSM of all changes in Plan enrollment. Until BCBSM has been properly notified of changes to Group's Plan enrollment, BCBSM shall continue to process Claims for Enrollees as listed on BCBSM's computer membership programs. Group represents and warrants that any eligibility and status changes it requests are compliant with and permissible under applicable state and federal law, including the PPACA; and, agrees that it will only request eligibility and status change requests that are compliant with and permissible under applicable state and federal law, including the PPACA.

C.      Claims Processing.

During the term of this Contract, requests for payment from Michigan providers will be directly submitted to BCBSM and shall be processed according to BCBSM's standard operating procedures for Claims. Requests for payment from out-of-state providers may, depending on the type of request for payment, be directly submitted to the appropriate out-of-state BCBS Plan and shall be processed pursuant to the BlueCard Program as set forth in Schedule B.

D.      Disputed Claims.

Group shall notify BCBSM in writing of any Claim that Group disputes within 60 days of Group's access to a paid Claims listing. BCBSM shall investigate such Claims and respond to Group within a reasonable time period. Upon BCBSM's request, Group shall execute any reasonably necessary documents that will allow BCBSM to recover any amounts that may be owed by a third party with respect to such disputed Claim. If BCBSM recovers any amount from a third party or if BCBSM determines that the disputed Claim is not Group's financial responsibility or is incorrect, then BCBSM shall give Group a credit for the recovered or corrected amount (reduced by any stop loss credits given by BCBSM relating to such disputed Claim).

E.      Subrogation.

BCBSM shall be subrogated to all of Group's, the Plan's, or an Enrollee's rights with respect to any Claim, however, BCBSM is not obligated to institute or become involved in any litigation concerning such Claim. BCBSM will use reasonable efforts to identify Claims in which the Group may have a subrogation or reimbursement interest. BCBSM will evaluate information provided by the Enrollee and other sources to determine whether a subrogation or reimbursement interest exists. BCBSM will not be obligated to undertake any such recovery litigation unless mutually agreed to by BCBSM and Group in writing. Absent written agreement, should Group elect to pursue such recovery litigation, BCBSM agrees to cooperate in Group's recovery efforts. BCBSM will remit to Group the funds recovered from third parties, less any expenses BCBSM has incurred in the recovery effort, including any attorney fees. BCBSM may assign or subcontract a portion of its duties under this provision of the Contract to third parties. Group will assist BCBSM or its assignee or subcontractor as reasonably necessary for BCBSM, its assignee, or subcontractor to carry out its duties under this provision.

Group authorizes BCBSM to act on behalf of Group and/or the Plan in any health care class action litigation of which BCBSM has knowledge, including but not by way of limitation, drug manufacturer and product liability litigation. BCBSM will take reasonable steps to notify Group of such class action litigation. Group will notify BCBSM if Group desires to independently pursue such litigation and BCBSM will reasonably cooperate with Group. As part of BCBSM's subrogation duties, BCBSM will use reasonable efforts to identify Claims that may be included in such class action litigation. BCBSM may institute and participate in such class action litigation, however, Group acknowledges that

3

ASC Weekly Invoiced Program – CID# 279476

BCBSM is not obligated to do so unless BCBSM and Group otherwise agree in writing. Group will reasonably cooperate with BCBSM with respect to any such litigation. BCBSM may assign or subcontract a portion of its duties under this provision to third parties. Group authorizes BCBSM to settle or compromise any litigation and BCBSM will remit to Group any funds recovered, less any expenses that BCBSM has incurred in participation of such class action litigation.

F.    Litigation.

If a third party initiates a claim, suit, or proceeding against the Plan, Group, or BCBSM relating to benefits payable under the Plan or any of the administrative services subject to this Contract ("Litigation"):

1.    Each party shall provide prompt written notice of the Litigation to the other party if served with such Litigation.

2.    Group may, with BCBSM's consent, request that BCBSM select counsel and defend litigation. BCBSM retains the right to deny this request and enforce Group's obligation to defend the Litigation.

3.    Whenever Group or BCBSM is a party in any Litigation, regardless of who is obligated to defend the litigation, Group and BCBSM each reserve the right, at its own cost and expense, to retain counsel to protect its own interests.

4.    Regardless of who is obligated to defend the litigation, Group and BCBSM shall reasonably cooperate with each other to provide all relevant information and documents within their respective control that are not subject to a privilege or confidentiality obligation; and to reasonably assist each other to defend, settle, compromise, or otherwise resolve the Litigation. Whenever either party is served with any Litigation, the party served shall take all steps necessary to prevent a default in the Litigation prior to determining which party will defend such Litigation.

5.    BCBSM shall have full authority to settle or compromise such Litigation, without Group's specific consent, unless:

    a.    $50,000 or more is at issue in the Litigation;
    b.    State tax issues or mandated benefit issues are part of the Litigation and Group has requested BCBSM to defend the Litigation; or
    c.    Settlement of the Litigation could have a material adverse impact on Plan costs or administration.

    If Group's consent to settle or compromise Litigation is required, such consent shall not be unreasonably withheld. If Group withholds consent for any reason and the final resolution of the Litigation is equal to or greater than a settlement or compromise proposed by BCBSM, Group shall pay BCBSM the additional cost of any subsequent settlement, compromise or judgment including all of BCBSM's reasonable attorney fees and costs for proceeding with the Litigation.

6.    When Group is obligated to defend the Litigation, Group shall have full authority to settle or compromise such Litigation without BCBSM's consent, unless BCBSM has notified Group that the Litigation may have a material adverse impact on BCBSM.

    If BCBSM's consent to settle or compromise Litigation is required, such consent shall not be unreasonably withheld. If BCBSM withholds consent for any reason and the final resolution of the Litigation is equal to or greater than a settlement or compromise proposed by Group, BCBSM shall pay the additional cost of any subsequent settlement, compromise or judgment including all of Group's reasonable attorney fees and costs for proceeding with the Litigation.

4

7.      When BCBSM defends the Litigation, the cost and expenses of such defense shall be paid by BCBSM. The cost and expenses of such defense shall include reasonable attorney fees and other reasonable litigation costs, however, any settlement or payment of amounts that are the financial responsibility of Group, including but not limited to Claims, (via judgment, award, etc.) shall be paid by Group.

8.      Subject to paragraph 7 above, when the Group defends the Litigation, the cost and expenses of such defense shall be paid by Group. The cost and expenses of such defense shall include reasonable attorney fees and other reasonable litigation costs and any settlement or payment for benefits or Claims shall be paid by Group.

G.      **Group Audits.**

Group, at its own expense, shall have the right to audit Claims incurred under this Contract; however, audits shall not occur more frequently than once every twelve months and shall not include Claims from previously audited periods or Claims paid prior to the last 24 months. Both parties acknowledge that Claims with incurred dates over two years old may be more costly to retrieve and that it may not be possible to recover over-payments for these Claims; however, BCBSM shall use best efforts to retrieve such Claims.

All audits shall be conducted pursuant to BCBSM corporate policy and other requirements at the time of the audit. The parties acknowledge staffing constraints may exist in servicing concurrent Group initiated audits. Therefore after notice from Group requesting an audit, BCBSM will have 60 to 90 days, depending on scope and sample size, to begin gathering requested documentation and to schedule the on-site phase of the audit.

Sample sizes shall not exceed 200 Claims and shall be selected to meet standard statistical requirements (i.e., 95% Confidence Level; precision of +/- 3%). Group shall reimburse BCBSM for Claims documentation in excess of 200 Claims at $50 per Claim.

Following the on-site activity and prior to disclosing the audit findings to Group, the auditor shall meet with BCBSM Management and present the audit findings. BCBSM, depending upon the scope of the audit, shall be given a reasonable period of time to respond to the findings and provide additional documentation to the Auditor before the Auditor discloses the audit findings to the Group.

BCBSM shall have no obligation to make any payments in connection with audit findings to Group unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable. No adjustments or refunds shall be made on the basis of the auditor's statistical projections of sampled dollar errors. An audit error will not be assessed if the Claim payment is consistent with BCBSM policies and procedures, or consistent with specific provisions contained in this Contract or other written Group instructions agreed to by BCBSM.

Prior to any audit, Group and BCBSM must mutually agree upon any independent third party auditor that Group wishes to perform the audit. Additionally, prior to audit, Group and any third party auditor shall sign all documents BCBSM believes necessary for the audit which will, at a minimum, provide for: the scope of the audit; the costs for which BCBSM is to be reimbursed by Group; the protection of confidential and proprietary information belonging to BCBSM, and of any patient specific information; and the indemnification and hold harmless of BCBSM from any claims, actions, demands or loss, including all expenses and reasonable attorney fees, arising from any suit or other action brought by an individual or provider to the extent caused by Group or its auditor.

Group shall provide BCBSM with a copy of any internal audit or review of the services performed under any agreement with BCBSM.

5

H.    Disclosures.

Group shall disclose the following to Enrollees in writing:

1.    BCBSM services being provided.
2.    BCBSM does not insure any Enrollees.
3.    Group is responsible for the payment of Claims.
4.    Group is responsible for changes in Plan benefits.
5.    Group is responsible for enrollment.

I.    Health Care Provider Interest.

Group acknowledges that various states including Michigan have enacted prompt payment legislation with respect to the payment of Claims that may require the payment of interest to providers under circumstances dictated by statute. BCBSM will invoice the Group for any interest required by statute and Group shall pay such interest. Additionally, out-of-state Claims may be inclusive of any interest owed by statute or required by the terms of provider contracts with the out-of-state BCBS Plan. Out-of-state Claims are reported and billed to Group as submitted to BCBSM by the out-of-state BCBS Plan.

J.    Confidentiality.

The terms of this Contract and the items set forth below are confidential and shall not be disclosed or released to a third party without the prior written consent of BCBSM, unless required by law.

1.    Claim Information
Enrollee personal or individually identifiable health information.

2.    Provider Proprietary Information
Health care provider names, addresses, tax identification numbers, and financial amounts paid to such providers.

3.    BCBSM and Other BCBS Plan Proprietary Information
BCBSM's or any other BCBS Plan's methods of reimbursement, amounts of payments, discounts and access fees; BCBSM's administrative fees and, if applicable, stop loss fees; those processes, methods, and systems developed for collecting, organizing, maintaining, relating, processing and transacting comprehensive membership, provider reimbursement and health care utilization data.

K.    Amounts Billed.

1.    Claims:

The Claims billed to Group include both service-based and value-based reimbursement to health care providers. Group acknowledges that BCBSM's negotiated reimbursement rates include all reimbursement obligations to providers including provider obligations and entitlements under BCBSM Quality Programs. Service-based reimbursement means the portion of the negotiated rate attributed to a particular health care service. Value-based reimbursement is the portion of the negotiated reimbursement rate attributable to BCBSM Quality Programs, as described in the Exhibit to Schedule A.

BCBSM negotiates provider reimbursement rates and settles provider obligations on its own behalf, not Group. Through this contract, Group receives the benefit of BCBSM provider rates, but it has no entitlement to a particular rate or to unbundle the service-based or value-based components of Claims. BCBSM does not retain any portion of Claims as compensation. All amounts collected from Group in Claims are used to satisfy provider obligations. Group agrees to pay Claims as defined herein.

Out-of-state Claims processed through the BlueCard Program, shall be calculated according to the BlueCard Program policies and procedures, as set forth in Schedule B.

6

2. Additional Administrative Compensation:

Group shall pay Additional Administrative Compensation ("AAC") as set forth in Schedule A unless the Group has elected a Full Fixed Administrative Fee in lieu of AAC. AAC is calculated as a percentage of BCBSM discounts on Michigan hospital Claims with a cap and floor as set forth in Schedule A.

3. Health Care Provider Interest:

See Article II.I.

4. Taxes and Surcharges:

State and Federal governments may impose surcharges or taxes on Claims. The State of Michigan imposes a tax on all Michigan Claims for Michigan residents. Tax rates are governed by applicable law.

Such surcharges or taxes, where imposed by law, may be invoiced to Group or billed and reported to Group in Claims. Group agrees to pay all such surcharges or taxes.

5. Pharmacy Benefits Services:

If Group elects BCBSM pharmacy benefits, Amounts Billed shall include pharmacy Claims and any claims processing, pharmacy fees, and rebate processing fees set forth in Schedule A.

6. Amounts Billed shall also include any fee or charge identified in Group's Schedule A, including but not limited to Group's Administrative Fee.

L.    Coordination with Medicare.

Group shall timely notify BCBSM whether Medicare is the primary payer for Claims of any Enrollee. BCBSM shall change such Enrollee's eligibility record within 15 business days of BCBSM's receipt of Group's notice. Group shall indemnify and hold harmless BCBSM for any claim, demand, judgment, penalty or other liability that arises out of Group's failure to provide timely notice to BCBSM.

M.    Pharmacy Benefits.

To the extent Group has engaged BCBSM to administer prescription drug claims for its Plan, BCBSM or its subcontractor shall process all prescription drug claims according to Group's benefit design and BCBSM's participating pharmacy contracts.

Group acknowledges that payments to participating pharmacies may include prescription drug costs, dispensing fees, and incentive fees for dispensing a generic drug or compounding a prescription drug.

Group authorizes BCBSM to act and serve as Group's exclusive agent for the purpose of negotiating with and obtaining rebates from pharmaceutical manufacturers. Group understands and agrees that BCBSM may directly contract with pharmaceutical manufacturers or BCBSM may contract with various subcontractors that have contracts with pharmaceutical manufacturers. BCBSM's rebate administrators retain a portion of the total rebates collected from drug manufacturers as a rebate administration fee. BCBSM will pass on to Group rebates net of rebate administration fees. If BCBSM receives rebate adjustments or de minimis amounts of unidentifiable rebates that cannot practicably be tied to particular claims, BCBSM will proportionally allocate those rebate amounts to customers with pharmacy benefits.

Pharmacy administration fees and rebate administration fees are set forth in Schedule A.

7

ASC Weekly Invoiced Program – CID# 279476

ARTICLE III
FINANCIAL RESPONSIBILITIES

A.    Group Responsibilities.

Group shall be liable for all risks, financial obligations, Amounts Billed, fees, and interest set forth in this Contract, including Schedules A, B, and C. Group shall also be liable for any statutory court costs and attorney's fees awarded by a court to Enrollees, and all other liabilities which BCBSM may assume or which might otherwise attach with respect to the administration of Coverages pursuant to this Contract, including Schedules A, B, and C. Group shall make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations, and liabilities.

B.    Scheduled Payments by Group.

Group shall make payments of amounts due and owing as set forth on Schedule A, including, but not by way of limitation, (1) administrative fee per Employee and additional administrative compensation, if any; (2) the hospital advance; and (3) Amounts Billed.

C.    Interest.

Pursuant to the instructions in Schedule A, Group shall pay the Estimated Weekly Payment to a designated BCBSM bank account, which funds other BCBSM accounts. To the extent any of those bank accounts are interest bearing, BCBSM retains any interest earned and will not pay or credit any interest to Group. Additionally, banks holding BCBSM accounts may retain float interest earned on transactions with the funds in those accounts.

D.    Schedule A Renewals.

Thirty (30) days prior to each Renewal Date, BCBSM shall send Group a Schedule A for the new Contract Year with all pricing terms, including BCBSM's administrative fee, applicable AAC, interest rates, and any new Michigan hospital advance. Such Schedule A may specify the pricing terms for a single Contract Year or, with the agreement of BCBSM and Group, may specify the pricing terms for multiple Contract Years. The renewal term Schedule A as received by the Group shall be considered fully executed and effective on the Renewal Date unless the Group notifies BCBSM prior to the Renewal Date that the contract will not be renewed.

E.    Group's Weekly Wire and Other Payments.

Group shall make weekly payments of all amounts due to BCBSM within one business day of the payment day set forth in the Schedule A. In addition, Group shall pay to BCBSM any separately invoiced amounts within fifteen (15) days of invoice or settlement receipt. If Group's payment for any amount payable under this Contract is more than one business day late, Group shall pay a late fee of the lesser of two percent of any outstanding amount due or the maximum amount permitted by law. In addition, BCBSM may cease to process Claims retroactive to the last date for which full payment was made.

F.    Settlements.

1.    Annual Settlements. Group shall receive its Annual Settlement approximately one hundred twenty (120) days after the end of each Contract Year, which may include a reconciliation of the administrative fee based on BCBSM's enrollment records for the Contract Year at the time the reconciliation is performed. Because reconciliation of Group's hospital Claims depends on BCBSM's final settlement with the hospitals, a separate settlement process called CSR, explained below, captures that reconciliation.

If the Group has an arrangement whereby it pays AAC, the total AAC reported to Group with the Annual Settlement equals the total amount of AAC collected from Group during the year in Amounts Billed less any AAC that was refunded to Group pursuant to a stop-loss insurance policy

8

with BCBSM. If the total AAC exceeds the maximum AAC set forth in Schedule A, BCBSM shall return the excess AAC to Group. If the total AAC is less than the minimum AAC set forth in Schedule A, Group shall pay BCBSM the shortfall. Neither Group nor BCBSM shall pay any interest on these payments/refunds.

2. **Customer Savings Refund.** Customer Savings Refund (CSR) is the annual report reconciling Group's Amounts Billed during the 12-month period 7/1 – 6/30 with any of the following items settled during the same period: (1) retroactive adjustments made in the Michigan Hospital Settlement (MHS), explained below, (2) drug rebates received pursuant to Group's Pharmacy Benefits arrangement, (3) class action recoveries, and (4) any other settlements from litigation and provider audits for which claim readjudication is not practicable.

If a refund is due, Group will receive a CSR payment in the year following the close of the CSR period. In the case of a liability resulting from the MHS, the liability will be reported to Group in the year following the close of the CSR period. A liability will accumulate with interest and be offset against future CSR payments. BCBSM may in its sole discretion elect not to offset any MHS liability against some or all drug rebates.

MHS liabilities will continue to accumulate from year to year unless Group elects to pay the liability or CSR payments in subsequent years exceed the amount of Group's outstanding MHS liability. BCBSM may in its sole discretion invoice Group for some or all of Group's CSR liability, which invoice shall be paid within thirty (30) days of receipt by Group.

The MHS is designed to reconcile amounts BCBSM paid to a hospital during a year with the total amount of reimbursement due to the hospital. Pursuant to separate agreements between BCBSM and Michigan hospitals, BCBSM makes periodic estimated payments to each hospital based on expected claims for all BCBSM customers. At the end of the contract year with the hospital, BCBSM settles the amount the hospital received in payments with actual claims experience, hospital reward and incentive payments under Quality Programs, and hospital obligations to Quality Programs. The MHS will result in a gain or loss applied to Group's CSR.

Group will not receive a CSR or incur adjusted liability attributable to a particular hospital until after the finalization of the MHS for a particular hospital. Group's refund or liability attributable to a particular hospital gain or loss, respectively, is proportionate to Group's utilization for that hospital.

G.    Changes in Enrollment or Coverages – Effect on Pricing Terms.

If there is more than a 10 percent (10%) change in the number of Enrollees from the number stated in Schedule A during any month of the Contract Year or a change in Coverages, BCBSM may immediately revise any affected pricing terms in the Schedule A to reflect such changes in Enrollment and/or Coverages. Any revisions will be effective beginning with the next month following thirty (30) day notification by BCBSM to the Group. The revised Schedule A will be treated as executed by Group and effective as of the date it is received by Group.

## ARTICLE IV
## TERMINATION AND TERMINATION ASSISTANCE

A.    Termination & Notice.

1.    **With or Without Cause.** Either party may with or without cause provide notice of intent to terminate this Contract by giving written notice to the other party. For the ninety (90) days following such written notice, each Party's obligations and entitlements will remain unaltered. At the conclusion of this ninety (90) day notice period, no claims with service dates following the conclusion of the ninety (90) day notice period will be approved and the Transition Assistance Period ("TAP") will begin, which will conclude 24 months later, at which time the contract will be terminated.

9

2. **Nonpayment, Partial Payment, Insolvency, or Bankruptcy.** Notwithstanding any other Contract provisions, if Group fails to timely pay any amounts owed or becomes insolvent or files for bankruptcy protection, BCBSM may at its option, after giving five (5) days notice in writing, cause the contract to immediately enter the TAP.

3. **Termination within the First Contract Year.** If Group gives notice of termination of the Contract before the end of the first Contract Year or if BCBSM terminates the contract under paragraph (2.) before the end of the first Contract Year, Group's total administrative fee liability to BCBSM shall be twelve months of administrative fees at the rate stated in Schedule A in order to compensate BCBSM for the costs of setting up and implementing the arrangement. Group's termination liability for administrative fees shall be determined using the average monthly enrollment prior to termination times twelve months, and shall be net of administrative fees paid prior to termination.

B. **Transition Assistance Period.**

Once written notice of termination has been given under Section A of this Article and the notice period has expired, the parties will continue to perform, and this Contract will continue, with respect to each party's obligations related to the wind-down of this Contract as set forth in this Section for the TAP. Upon the expiration of the TAP, this Contract shall terminate. The date on which the applicable notice period has expired following a termination trigger and on which the TAP commences will be called the "TAP Effective Date."

1. **End of Coverage.** Notwithstanding any other provisions contained herein, neither BCBSM nor any BCBS Plan shall have any obligation for payment for any health care services which are incurred after the TAP Effective Date.

2. **Obligation to Pay.** Notwithstanding any other provisions contained herein, Group's obligation to pay amounts incurred under the Contract shall survive during the TAP, and Group shall continue to timely pay all amounts owed. All Claims incurred prior to the TAP Effective Date, but not paid before that date, shall be processed by BCBSM or other BCBS Plans pursuant to the terms and conditions in this Contract and separate agreements with providers. Group agrees that it shall have no right to have any Claims incurred before the TAP Effective Date processed by a replacement carrier or administrator.

   BCBSM retains the right to cease paying Claims if, during the TAP, Group fails to timely pay BCBSM for Amounts Billed and/or if Group is insolvent and/or files for bankruptcy protection. Group represents and warrants that it understands that it will be solely liable for any Claims BCBSM does not pay as a result of Group's failure to make timely payment to BCBSM, and Group will indemnify, defend, and hold BCBSM harmless for any Litigation or other adversary proceeding brought by an Enrollee whose claim was not paid by BCBSM as a result of Group's failure to timely pay BCBSM. This paragraph is independent of BCBSM's rights under Art. IV.A.2.

3. **Claim Payments.** For the first three (3) months following the TAP Effective Date, Group shall make weekly payments in the same manner as prior to the TAP Effective Date; however, Group shall pay the fixed administrative fee for only the first two months after the TAP Effective Date. AAC, if any, will continue to be paid for the TAP. For the next twenty-one (21) months, BCBSM will invoice Group each month and Group shall make payments to BCBSM. After six months from the TAP Effective Date, BCBSM shall offset any Amounts Billed against the Michigan hospital advance.

4. **Settlement-Last Contract Year.** Within one hundred eighty (180) days following the TAP Effective Date, BCBSM shall prepare a settlement statement for the last Contract Year. Such settlement statement shall include any compensation to BCBSM, including administrative fees.

5. **Interest.** If the total amount of the estimated Amounts Billed included in the weekly payments made during the first three (3) month period following termination exceed the actual Amounts Billed during the period, BCBSM will pay the Group interest at the then rate for short term government treasury bonds (STIGB), which is currently calculated as a rolling twelve-month

10

average of the 90-day T-Bill yield rate on the average monthly balance of any excess. The total amount of any excess will be included in the settlement for the last Contract Year.

6. Final Settlement. Within ninety (90) days after the expiration of the Transition Assistance Period, BCBSM will prepare a final settlement and will refund any positive balance or invoice Group for any negative balance. Any negative balance will be due within ten (10) days of the date of invoice. The payment to Group or to BCBSM as provided in the immediately preceding sentence shall fully and finally settle, release, and discharge each party from any and all claims that are known, unknown, liquidated, non-liquidated, incurred-but-not-reported, adjustments, recoupments, receivables, recoveries, rebates, hospital settlements, and other sums of money due and owing between the parties and arising under this Contract.

7. Group Duty to Notify/Indemnity. Group shall notify BCBSM if, as a result of its insolvency or other status, another party is required by law to receive any refunds, payments, or returned funds from BCBSM under this Article IV. Group shall indemnify, defend, and hold BCBSM harmless for any liability, including attorney fees, resulting from Group's failure to notify BCBSM under this paragraph.

C. **Conversion to Underwritten Group.**

If Group converts from a self-funded group to a BCBSM underwritten group, Group shall continue to be obligated for any balance due and Group shall timely pay the amounts due and owing under this Contract in addition to any premium payments as a BCBSM underwritten group.

## ARTICLE V
## GENERAL PROVISIONS

A. **Entire Agreement.**

This entire Contract, including Schedules, represents the entire understanding and agreement of the parties regarding matters contained herein. This Contract supersedes any prior verbal or written agreements and understandings between the parties and shall be binding upon the parties, their successors or assigns.

B. **Indemnity.**

Group agrees to indemnify, defend and hold BCBSM harmless from any claims resulting from Group's breach of any term of this Contract and/or breach of any obligation or duty not expressly delegated to BCBSM in this Contract, including, but not limited to, Group's obligation to manage enrollment, to disclose Plan information to Enrollees, to respond to requests for Plan documents, and to read and understand the terms of this Contract.

The indemnity and hold harmless provisions of this Contract shall survive the termination of the Contract.

C. **Service Mark Licensee Status.**

BCBSM is an independent licensee of BCBSA and is licensed to use the "Blue Cross" and "Blue Shield" names and service marks in Michigan. BCBSM is not an agent of BCBSA and, by entering into this Contract, Group agrees that it made this Contract based solely on its relationship with BCBSM or its agents. Group agrees that BCBSA is not a party to this Contract, has no obligations under this Contract, and that no BCBSA obligations are created or implied under this Contract.

D. **Notices.**

Unless otherwise provided in this Contract, any notice required shall be given in writing and sent to the other party either by hand-delivery, electronic mail message to designated representative of the

11

other party, or postage pre-paid US first class mail at the following address or such other address as a party may designate from time to time.

|  |  |
|---|---|
| If to Group: | If to BCBSM: |
| Current address shown on<br>BCBSM Group Header | Blue Cross Blue Shield of Michigan<br>600 Lafayette East, Mail Code B612<br>Detroit, Michigan 48226-2998 |

E.    Amendment.

This Contract may be amended only by a written agreement duly executed by authorized representatives of each party provided, however that this Contract may be amended by BCBSM upon written notice to Group in order to facilitate compliance with applicable law including changes in regulations, reporting requirements or data disclosure as long as such amendment is applicable to all BCBSM groups that would be similarly affected by the legal change in question. BCBSM will provide thirty (30) calendar days notice of any such amendment and regulatory provision, unless a shorter notice is necessary in order to accomplish regulatory compliance.

Upon request by Group BCBSM will consult with Group regarding the regulatory basis for any amendment to this Contract as a result of regulatory requirements.

F.    Severability.

The invalidity or nonenforceability of any provision of this Contract shall not affect the validity or enforceability of any other provision of this Contract.

G.    Waiver.

The waiver by a party of any breach of this Contract by the other party shall not constitute a waiver as to any subsequent breach.

H.    Law.

This Contract is entered into in the State of Michigan and, unless preempted by federal law, shall be construed according to the laws of Michigan. Group agrees to abide by all applicable state and federal law. Group agrees that, where applicable, the federal common law applied to interpret this Contract shall adopt as the federal rule of decision Michigan law on the interpretation of contracts..

I.    HIPAA.

1.    Group Certification.

Group certifies that it is the Plan Sponsor and Plan Administrator, performs Plan administration functions, needs access to Enrollee protected health information to carry out such administration functions, and has amended the Plan documents to comply with the requirements of 45 CFR 164.504(f)(2). BCBSM is therefore authorized to provide Group with the minimum necessary Enrollee protected health information for Group to perform its plan administration functions.

2.    Business Associate Agreement.

The parties shall enter into a business associate agreement.

J.    Force Majeure.

Neither BCBSM nor Group shall be deemed to have breached this Contract or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Contract if

12

ASC Weekly Invoiced Program – CID# 279476

prevented from doing so by acts of God or the public enemy, fires, floods, storms, earthquakes, riots, strikes, boycotts, lock-outs, wars and war-operations, restraints of government, power or communication line failure, judgment, ruling, order of any federal or state court or agency of competent jurisdiction, change in federal or state law or regulation subsequent to the execution of this Contract, or other circumstances beyond the party's reasonable control for so long as such "force majeure" event reasonably prevents performance.

K.      **Group Disclosure of Other Coverage Vendors.**

Group agrees that, to the extent that BCBSM does not administer all of Plan's "essential health benefits," as that term is defined by the PPACA, Group shall identify for BCBSM all those vendors ("Vendors") that are also providing or administering essential health benefits to the Plan's participants, the benefits the Vendors are providing to them, the number of participants receiving such benefits, and the cost sharing arrangements for such benefits.

In addition, Group shall cause its officers, directors, employees, and representatives and Vendors' officers, directors, employees and representatives to fully and timely cooperate with BCBSM and provide it with the necessary information for BCBSM to ensure its compliance and that of the Plan with PPACA to the extent BCBSM is obligated to do so by law or by contract. This information includes, but is not limited to, social security numbers or other forms of government identification numbers of each Plan participant and beneficiary.

Group is solely responsible to ensure Group's maximum out-of-pocket amount is in compliance with PPACA. If BCBSM agrees to assist Group in determining whether Group's maximum out-of-pocket amount is in compliance with PPACA, then Group authorizes all Vendors to, and shall inform the Vendors in Group's contract with them that they must, effective on the beginning of the Group's first plan year on or after January 1, 2014, disclose to BCBSM on a daily basis (or some other regularly scheduled period as determined by BCBSM) all claims data for the essential health benefit(s) of Plan participants and beneficiaries that they possess.

L.      **Other Data Requirements.**

Group agrees to provide to BCBSM all data reasonably necessary for BCBSM to comply with the requirements of PPACA or other applicable federal or state laws. Such data includes, but is not limited to, all Enrollee data needed to comply with any reporting or other requirements of PPACA, e.g., the employer's share of any premium and social security or tax identification numbers. Group certifies that if it fails to provide all the data requested and if it has provided such information to BCBSM in response to a previous request, then Group shall be deemed to have certified to BCBSM that such information previously supplied remains correct and can be relied upon.

Group and Group's Vendors will maintain relevant books, records, policies, procedures, internal practices, and/or data logs relating to this Contract in a manner that permits review for a period of seven (7) years or (ten (10) years in the case of Medicare/Medicaid transactions) after the expiration of this Contract. With reasonable notice and during usual business hours, BCBSM, or its designated third party (with appropriate confidentiality obligations), may audit those relevant books, records, policies, procedures, internal practices, and/or data logs of Group and/or its Vendors, as necessary, to verify calculations related to the imposition of any taxes and fees under PPACA or other federal or state laws and to ensure compliance with this Contract and any applicable federal and state laws. Group shall cooperate with BCBSM in all reasonable respects in connection with such audits.

BCBSM's failure to detect, failure to notify Group of detection, or failure to require Group's remediation of any unsatisfactory practices does not relieve Group of its responsibility to comply with this Contract or applicable law, does not constitute acceptance of such practice, and does not constitute a waiver of BCBSM's enforcement rights under this Contract or applicable law.

If Group conducts, or contracts to have conducted, an internal audit or review of the services performed under any agreement with BCBSM, Group shall provide BCBSM with a copy of such audit or review within thirty (30) days of BCBSM's written request. This also applies to audits/reviews performed by or at the request of any federal or state regulatory agencies of BCBSM services. The

13

ASC Weekly Invoiced Program – CID# 279476

selection of an independent auditor by Group to conduct an internal audit of Group does not preclude BCBSM from conducting an audit in accordance with the terms contained herein.

The provisions of this Section shall survive the termination of this Contract.

M.  **Grandfather Status; Women's Preventative Care Religious Exemption.**

Group acknowledges and agrees that unless a written certificate of grandfather status and indemnity in form and substance satisfactory to BCBSM was previously provided to BCBSM by Group or, for a Group new to BCBSM as of January 1, 2013, was provided to and accepted by BCBSM concurrently with the signing of this Contract, Group will be considered non-grandfathered for all purposes.

In addition, Group acknowledges that the health care coverages provided to its Enrollees will include recommended women's preventive health services without cost sharing (as required by PPACA) unless the Plan (i) is a grandfathered group health plan that has not provided such coverage or (ii) qualifies as either an exempt group health plan or one eligible for the temporary safe harbor under PPACA and has provided a certificate to that effect in form and substance satisfactory to BCBSM.

N.  **Summary of Benefits and Coverage.**

Group is solely responsible for compliance with the federal Summary of Benefit and Coverage (SBC) rules, including SBC creation and distribution. BCBSM does not assume any responsibility for SBC rule compliance relating to the Plan, or for creation or disclosure of compliant SBCs. BCBSM disclaims any liability or responsibility for any non-compliance by Plan with SBC rules and regulations relating to creation, disclosure or other requirements.

O.  **Plan Year.**

Group's Plan Year, as that term is defined in PPACA, is the one year period beginning on the Effective Date and ending one year (or less) later on the last day of the month immediately preceding the month in which the Effective Date falls ("Effective Date Month"). Each Plan Year thereafter shall begin on the first day of the Effective Date Month and end one year later.

If Group's Plan Year that is not consistent with that reflected in the preceding paragraph, Group will promptly notify BCBSM in writing. Group will notify BCBSM at least six months in advance of any change in the Plan Year.

P.  **Knowing Assent.**

Group acknowledges that it has had full opportunity to consult with such legal and financial advisors as it has deemed necessary or advisable in connection with its decision knowingly to enter into this Contract. Group acknowledges that it is its obligation as Plan Fiduciary to determine whether the financial arrangements set forth in this Contract and Schedules are an appropriate Plan expense and for the exclusive benefit of the Plan. Group acknowledges that it has had any questions about this Contract posed to BCBSM fully answered to Group's satisfaction.

Neither party has executed this Contract in reliance on any representations, warranties, or statements other than those expressly set forth herein.

Q.  **Group Health Plan Type; Attestation.**

Is Groups' Plan governed by ERISA?  ☐ Yes.  ☒ No.

Group attests that, to the best of its knowledge, this response is correct and acknowledges that BCBSM will rely on this response to determine requirements applicable to Group and the performance of this Contract.

14

ASC Weekly Invoiced Program – CID# 279476

AGREED AND ACCEPTED.

| BCBSM: | | GROUP: | |
|---|---|---|---|
| By: _~~Duane M. Moore~~_ <br> (Signature) | | By: _(signature)_ <br> (Signature) | |
| Name: (Print) _Yvonne Moore_ | | Name: (Print) _M. Therese Brumfield_ | |
| Title: _Ast Mgr._ | | Title: _VP, Provider Operations_ | |
| Date: _5/24/16_ | | Date: _5-23-16_ | |

| | | | |
|---|---|---|---|
| By: _(signature)_ <br> (Signature) | | By: <br> (Signature) | |
| Name: (Print) _Gary R. Gaulin_ | | Name: <br> (Print) | |
| Title: _VP, KLGB_ | | Title: | |
| Date: _6-16-16_ | | Date: | |

ASC Weekly Invoiced Program – CID#



EXHIBIT B



**Blue Cross
Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

| | | | |
|---|---|---|---|
| **Group Name** | CORIZON HEALTH, INC. | **Invoice Due Date** | 05/01/2022 |
| **Group Number** | 000071499 | **Invoice Date** | 04/12/2022 |
| **Invoice Number** | 141444768 | **Invoice Type** | MONTHLY INVOICED |
| **Total Balance Due** | $3,410,136.51 | **Bill Period** | 03/01/2022-03/31/2022 |

## Previous Invoice Summary

| | |
|---|---|
| Previous Balance | $3,376,244.91 |
| Balance Forward | $3,376,244.91 |

## Claim Summary

| Utilization Summary | Unit | Current Charges |
|---|---|---|
| Facility - Cases | 44 | $1,225.70CR |
| Professional - Clm | 115 | $35,024.65 |

## Taxes and Fees Summary

| Fee Type | Rate | Unit | Total |
|---|---|---|---|
| BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP | | | $92.65 |
| ADVANCE DEPOSIT | | | $0.00 |

## Total Charges Summary

| | |
|---|---|
| Total Current Charges | $33,891.60 |
| Total Balance Due | $3,410,136.51 |

Non-payment of this bill will result in cancellation of this policy retroactive to the last date for which full payment was made.

If there are questions concerning this invoice, contact Group Customer Inquiry and Billing Dept.
Phone: 1-800-446-5251   Email: ascbilling@bcbsm.com

Payment Options:
Wire Payment



**Blue Cross**
**Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

ACH Payment

eBilling Application

Mail your regular or overnight payment to:     Blue Cross Blue Shield of Michigan
600 Lafayette E. Mail Code 1002
ATTENTION: ASC BILLING
Detroit, Michigan 48226



# EXHIBIT C

March 18, 2022

Jeff Sholey
Isaac Lefkowitz
Corizon Health, Inc.
105 Westpark Drive, Suite 200
Brentwood, TN 37027

      Re:    Payment of Outstanding Balance Owed to BCBSM

Dear Mr. Sholey and Mr. Lefkowitz:

Corizon Health, Inc. and Blue Cross Blue Shield of Michigan were parties to an administrative services contract ("ASC"), effective December 1, 2015, in which BCBSM processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Corizon. As a result of Corizon's loss of a servicing contract with the state of Michigan, Corizon terminated the ASC with a termination effective date of September 30, 2021. Pursuant to the terms of the ASC, Corizon is responsible for reimbursing BCBSM for all claims incurred by incarcerated individuals prior to September 30, 2021 and paying BCBSM administrative fees for processing such claims. As of the date of this letter, the total balance owed by Corizon is $3,359,102.28 per the attached invoice.

BCBSM demands that Corizon make full payment of the outstanding balance owed by March 31, 2022. If BCBSM does not receive payment by this date, BCBSM will pursue all rights and legal remedies, including litigation, to recover this amount. In addition, BCBSM will notify the Michigan Department of Technology and the Michigan Department of Corrections of Corizon's failure to pay amounts owed.

Sincerely,

Robert Fine
Assistant General Counsel
Blue Cross Blue Shield of Michigan
rfine@bcbsm.com

cc: Jason Helling; Yvonne Johnson

Enclosures



**Blue Cross Blue Shield** of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

| | | | |
|---|---|---|---|
| **Group Name** | CORIZON HEALTH, INC. | **Invoice Due Date** | 03/01/2022 |
| **Group Number** | 000071499 | **Invoice Date** | 02/10/2022 |
| **Invoice Number** | 138326093 | **Invoice Type** | MONTHLY INVOICED |
| **Total Balance Due** | $3,359,102.28 | **Bill Period** | 01/15/2022-01/31/2022 |

## Previous Invoice Summary

| | |
|---|---|
| Previous Balance | $3,229,610.76 |
| Balance Forward | $3,229,610.76 |

## Claim Summary

| Utilization Summary | Unit | Current Charges |
|---|---|---|
| Facility - Cases | 16 | $2,472.79 |
| Professional - Clm | 33 | $12,308.22 |

## Taxes and Fees Summary

| Fee Type | Rate | Unit | Total |
|---|---|---|---|
| CUSTOMER SAVINGS REFUND - CANCELLED GRO | | | $113,824.10 |
| BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP | | | $886.41 |
| ADVANCE DEPOSIT | | | $0.00 |

## Total Charges Summary

| | |
|---|---|
| Total Current Charges | $129,491.52 |
| Total Balance Due | $3,359,102.28 |

Non-payment of this bill will result in cancellation of this policy retroactive to the last date for which full payment was made.

If there are questions concerning this invoice, contact Group Customer Inquiry and Billing Dept.
Phone: 1-800-446-5251   Email: ascbilling@bcbsm.com



**Blue Cross**
**Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

Payment Options:

Wire Payment

ACH Payment

eBilling Application

Mail your regular or overnight payment to:     Blue Cross Blue Shield of Michigan

600 Lafayette E. Mail Code 1002

ATTENTION: ASC BILLING

Detroit, Michigan 48226



DocuSign Envelope ID: 8259F666-E87C-4A6D-A37C-75CD869A9808

|  **Blue Cross Blue Shield Blue Care Network** of Michigan<br><br>Nonprofit corporations and independent licensees of the Blue Cross and Blue Shield Association | **GROUP SIGNATURE PAGE**<br><br>Effective for 12/01/2020 – 11/30/2021 |
|---|---|

| **Between Blue Cross Blue Shield of Michigan and**<br><br>**CORIZON HEALTH, INC (CID – 279476)** |
|---|

Group and Blue Cross Blue Shield of Michigan agree to sign the specified documents checked-off below ("Documents") via this Group Signature Page. Also included are the 2020 Exhibit 1 to Schedule A (Value-Based Provider Reimbursement), the 2020 Schedule B BlueCard Disclosures, and the 2020 Stop Loss Policy (if applicable).

Each party's Signature is the legal equivalent of a manual / handwritten signature on the specified Documents. By providing their Signatures below, the parties are legally bound by the terms and conditions in the Documents. Group agrees that no certification authority or other third-party verification is necessary to validate Group's Signature, and that the lack of such certification or third-party verification will not in any way affect the enforceability of Group's Signature or the Documents.

## Documents Included:

☐ **ASC Contract Amendment**

☒ **Schedule A**
- Exhibit 1 to Schedule A
- ☐ Exhibit 2 to Schedule A

- **Schedule B**
  - Exhibit 1 to Schedule B

### Stop-Loss Insurance

- **Stop-Loss Policy**

☐ Stop-Loss Exhibit

| *REQUIRES GROUP SELECTION (Specific Stop Loss Only)* | | |
|---|---|---|
| *Group is electing Specific Stop-Loss "Run-Out" Coverage:* | ☐ Yes ☐ No | |
| *Policyholder Initials:* | | |

☐ **Amendment to Stop-Loss Insurance**

Upon signature by the parties, this page will be electronically attached to the Documents and stored for reference and record. Group may review this documentation by requesting a copy from their BCBSM salesperson.

| **BLUE CROSS BLUE SHIELD OF MICHIGAN:** | | **GROUP CUSTOMER:** | |
|---|---|---|---|
| By: (Signature) | *Lori Shannon* (DocuSigned by) | By: (Signature) | *[signature]* |
| Name: (Print) | Lori Shannon | Name: (Print) | *Mason Coll* |
| Title: | Vp, Key Accounts | Title: | *VP of Operations* |
| Date: | 12/17/2020 | Date: | *12/9/20* |

DocuSign Envelope ID: 8259F666-E87C-4A6D-A37C-75CD869A9808

**Blue Cross Blue Shield of Michigan**
**SCHEDULE A – Renewal Term (Effective 12/01/2020 thru 11/30/2021)**
**Administrative Services Contract (ASC)**

1.  Group Name                     CORIZON HEALTH, INC
2.  Customer ID                    279476
3.  ASC Funding Arrangement        Monthly Invoice

4.  Line(s) of Business and Products

| Line of Business | Applicable |
|---|---|
| Facility | X |
| Facility Foreign | |
| Facility Domestic | |
| Professional | X |
| Prescription Drugs | |
| Dental | |
| Vision | |
| Hearing | |

| Products | Applicable |
|---|---|
| Flexlink | |

5.  Administrative Fees

The below administrative fees cover the Lines of Business and Products checked in Section 4 above, unless otherwise indicated.

   A.  Fixed Administrative Fees – *Not Applicable*

| B. Variable Administrative Fees | Percentage | Effective Date | Effective Date |
|---|---|---|---|
| i.  Additional Administrative Compensation* | 9.0% | 12/01/2020 | 11/30/2021 |

   *In exchange for a fixed administrative fee, BCBSM will retain as Additional Administrative Compensation (AAC), nine and one-half percent (9.5%) of the Michigan Hospital discounts. AAC is included in the medical claims cost that is contained in the Groups Amount Billed. The AAC is separate from and does not include BlueCard fees.

6.  Data Feeds

| Category | Data Feed | Pricing Method | Fee Amount | Monthly Cap | Start Date | End Date |
|---|---|---|---|---|---|---|
| Monthly Maintenance Fee | Standard Medical Claims to Corizon Health (PHS). | PCPM | $0.00 | -- | 12/01/2020 | 11/30/2021 |
| Monthly Maintenance Fee | Standard Dental Claims to Corizon Health (PHS). | PCPM | $0.00 | -- | 12/01/2020 | 11/30/2021 |
| Monthly Maintenance Fee | Standard Hearing Claims to Corizon Health (PHS). | PCPM | $0.00 | -- | 12/01/2020 | 11/30/2021 |

7.  Hospital Advance – *Not Applicable*

DocuSign Envelope ID: 8259F666-E87C-4A6D-A37C-75CD869A9808

8.    **Advanced Deposit Monthly Cap Amount** – *Not Applicable*

9.    **BCBSM Account**

| 1840-09397-3 | Comerica | 0720-00096 |
|---|---|---|
| Wire Number | Bank | American Bank Association |

10.   **Late Payment / Interest Charges**
      A. Late Payment Charge                          2%
      B. Health Care Provider Interest Charge          12%

11.   **Buy-Ups** – *Not Applicable*

12.   **Shared Savings Programs**
BCBSM has implemented programs to enhance the savings realized by its customers. As stated below, BCBSM will retain as administrative compensation a percent of the recoveries or cost avoidance. Administrative compensation retained by BCBSM through the Shared Savings Program will be available through reports obtained on eBookshelf:

| Program: | BCBSM Retention of: | |
|---|---|---|
| A. Pre-Payment Forensic Billing Review: | 30% | Cost avoidance of improper hospital billing identified by third party vendor(s) through forensic pre-payment billing review. |
| B. Advanced Payment Analytics: | 30% | Recoveries of claims overpayments identified by third party vendor(s) using proprietary data mining analytics and enhanced reviews. |
| C. Subrogation: | 30% | Recoveries of claims overpayments from subrogation efforts. |
| D. Provider Credit Balance Recovery: | 30% | Recoveries of claims overpayments obtained by third party vendor(s) through enhanced review of hospital patient accounting systems. |
| E. Non-Participating Provider Negotiated Pricing: | 30% | Cost avoidance for out-of-network, non-participating Claims equal to the difference between the amount that would have been paid pursuant to the Group's benefit design (before Enrollee cost-share is applied) and the amount actually paid for such Claims (before Enrollee cost-share is applied) as a result of third-party vendor negotiations or benchmark-based pricing. |
| F. Rebate Service Fee for Medical Prescription Drugs: | 10% | Medical benefit drug rebates on Claims incurred in the renewal term net of the Rebate Administrator Fee. The Rebate Administrator Fee is 5.25% of gross rebates for medical benefit drug Claims. |
| G. Rebate Service Fee for Pharmacy Prescription Drugs: | -- | *Not Applicable* |

13.   **Traditional Prescription Drug Pricing and Administrative Compensation** – *Not Applicable*

DocuSign Envelope ID: 8259F666-E87C-4A6D-A37C-75CD869A9808

### 14. 3rd Party Rx Vendor Fee

If Group's prescription drug benefits are administered by a third-party vendor, BCBSM will charge Group an administrative fee of $5.00 per contract per month due to the additional costs and resources necessary for BCBSM to effectively manage and administer the medical benefit without administering the prescription drug benefit.

### 15. 3rd Party Stop-Loss Vendor Fee

If Group obtains stop-loss coverage from a third-party stop-loss vendor, BCBSM will charge an additional fee of $8.00 per contract per month due to the additional costs and resources necessary for BCBSM to effectively manage Group's benefits.

### 16. Agent Fees

This Schedule A does not include any fees payable by Group to an Agent. If Group has an Agent Fee Processing Agreement on file with BCBSM, please refer to that agreement for fees and details.

### 17. Medicare Contracts

If Group has Medicare contracts that are being separated from the current funding arrangement, all figures within the current funding arrangement will be adjusted.

### 18. Compensation Agreement with Providers

The Group acknowledges that BCBSM or a Host Blue may have compensation arrangements with providers in which the provider is subject to performance or risk-based compensation, including but not limited to withholds, bonuses, incentive payments, provider credits and member management fees. Often the compensation amount is determined after the medical service has been performed and after the Group has been invoiced. The Claims billed to Group include both service-based and value-based reimbursement to health care providers. Group acknowledges that BCBSM's negotiated reimbursement rates include all reimbursement obligations to providers including provider obligations and entitlements under BCBSM Quality Programs. Service-based reimbursement means the portion of the negotiated rate attributed to a health care service. Value-based reimbursement is the portion of the negotiated reimbursement rate attributable to BCBSM Quality Programs, as described in Exhibit 1 to Schedule A. BCBSM negotiates provider reimbursement rates and settles provider obligations on its own behalf, not Group. Group receives the benefit of BCBSM provider rates, but it has no entitlement to a particular rate or to unbundle the service-based or value-based components of Claims.

BCBSM Quality Programs may also include risk sharing arrangements with certain provider entities ("PE"), e.g., physician organizations, facilities, health systems, or any combination thereof, that have contracted with BCBSM for upside and downside risk for a performance year. The PE's performance will be measured by comparing its total cost of care trend for attributed members to BCBSM's statewide total cost of care trend which may be equated to a per member per month amount. BCBSM will calculate each PE's performance approximately 11 months after the end of a performance year.

If the PE's performance results in a payment of additional reimbursement, Group may be invoiced an additional amount based on its attributed membership to that PE. If the PE's performance results in a return of reimbursement, Group may receive a credit based on its attributed membership to that PE. BCBSM will provide Group with supporting documentation for such amounts. Invoice or credit to Group will occur in conjunction with BCBSM's customer savings refund process as set forth in the administrative services contract.

Notwithstanding the above, in the first year of the program (2020), BCBSM will not invoice Group for any additional reimbursement earned by a PE. Moreover, reimbursement returned to BCBSM will be used to offset any additional reimbursement earned by a PE in the following year. BCBSM will not retain any amounts resulting from such risk sharing arrangements.

See Exhibit 1 to Schedule A and Schedule B to ASC for additional information.

DocuSign Envelope ID: 8259F666-E87C-4A6D-A37C-75CD869A9808

**19.   Out-of-State Claims**

Amounts billed for out-of-state claims may include BlueCard access fees and any value-based provider reimbursement negotiated by a Host Blue with out-of-state providers.  See <u>Schedule B to ASC</u> and <u>Exhibit 1 to Schedule A</u> for additional information.



# EXHIBIT E

## AFFIDAVIT OF YVONNE JOHNSON

State of Michigan )
                    ) ss
County of Wayne )

I, Yvonne Johnson, after being first duly sworn, say as follows:

1. I have attained the age of eighteen, I am competent to testify to the facts set forth herein, and make this Affidavit upon my personal knowledge and/or upon review of the records of the business.

2. I am a Client Engagement Manager for Blue Cross Blue Shield of Michigan.

3. In December of 2015, Blue Cross Blue Shield of Michigan ("BCBSM") and Corizon Health Inc. ("Corizon") were parties to an administrative services contract ("the contract"), in which BCBSM processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Corizon.

4. BCBSM performed the agreed-upon services and processed all medical claims pursuant to the contract.

5. On September 30, 2021, Corizon terminated the contract between the parties.

6. Pursuant to the terms of the contract, Corizon is responsible for reimbursing BCBSM for all claims incurred prior to September 30, 2021 and BCBSM sent invoices to Corizon detailing the amounts owed.

7. BCBSM sent multiple invoices to Corizon detailing the amounts owed. Corizon ignored all of these invoices.

8. BCBSM sent Corizon a demand letter in March of 2022, regarding the overdue balance and attached the invoice to this demand letter.

9. Corizon has not objected to the statements sent by BCBSM seeking payment for the agreed-upon services rendered by BCBSM.

10. As of the date of this document, Corizon has not made any payments and is justly indebted to BCBSM in the amount of $3,410,136.51, over and above all legal setoffs and counter-claims. (**Exhibit A**)

## AFFIDAVIT OF YVONNE JOHNSON

11. The statement of account attached is true and correct.

Dated:

Yvonne Johnson

Subscribed and sworn to before me
This 9 +H day of JUNE , 2022

Notary Public
WAYNE _____ County, MI
My Commission Expires: 4 - 9 - 23

MARTIN F PARODY
Notary Public, Wayne County, MI
My Commission Expires: April 9, 2023
Acting in the County of WAYNE

Page 2 of 2





**Blue Cross**
**Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

| | | | |
|---|---|---|---|
| **Group Name** | CORIZON HEALTH, INC. | **Invoice Due Date** | 05/01/2022 |
| **Group Number** | 000071499 | **Invoice Date** | 04/12/2022 |
| **Invoice Number** | 141444768 | **Invoice Type** | MONTHLY INVOICED |
| **Total Balance Due** | $3,410,136.51 | **Bill Period** | 03/01/2022-03/31/2022 |

### Previous Invoice Summary

| | |
|---|---|
| Previous Balance | $3,376,244.91 |
| Balance Forward | $3,376,244.91 |

### Claim Summary

| Utilization Summary | Unit | Current Charges |
|---|---|---|
| Facility - Cases | 44 | $1,225.70CR |
| Professional - Clm | 115 | $35,024.65 |

### Taxes and Fees Summary

| Fee Type | Rate | Unit | Total |
|---|---|---|---|
| BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP | | | $92.65 |
| ADVANCE DEPOSIT | | | $0.00 |

### Total Charges Summary

| | |
|---|---|
| Total Current Charges | $33,891.60 |
| Total Balance Due | $3,410,136.51 |

Non-payment of this bill will result in cancellation of this policy retroactive to the last date for which full payment was made.

If there are questions concerning this invoice, contact Group Customer Inquiry and Billing Dept.
Phone: 1-800-446-5251   Email: ascbilling@bcbsm.com

Payment Options:
Wire Payment



**A nonprofit corporation and independent licensee of the Blue Cross and Blue Shield Association**

ACH Payment

eBilling Application

Mail your regular or overnight payment to:     Blue Cross Blue Shield of Michigan

600 Lafayette E. Mail Code 1002

ATTENTION: ASC BILLING

Detroit, Michigan 48226