UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

       Plaintiff,

v

CORIZON HEALTH
INCORPORATED,


       Defendant.

Case No. 22-cv-11598

Hon. Mark A Goldsmith

_____/

Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
Attorneys for Plaintiff
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
(313) 965-7848
gabe.sybesma@kitch.com
paul.wilk@kitch.com

Phillip C Korovesis (P40579)
Attorney for Defendant
150 W Jefferson, Suite 200
Detroit, MI 48226
(313) 225-7000
korvesis@butzel.com

_____/

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**PURSUANT TO FED. R. CIV. P. 56**
**BRIEF IN SUPPORT, APPENDIX,**
**AND DECLARATION OF SERVICE**

I hereby certify that I have complied with all provisions of LR 7.1(a) on motion practice. The undersigned counsel personally spoke to opposing counsel, explainiung the nature of the relief sought, and opposing counsel expressly denied concurrence in the relief sought.

_/s/ Gabe Sybesma_
Gabe Sybesma (P66632)

LOCAL RULE CERTIFICATION: I, Gabe Sybesma, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

_/s/ Gabe Sybesma_
Gabe Sybesma (P66632)

NOW COMES Blue Cross Blue Shield of Michigan, by and through their attorneys, Kitch Drutchas Wagner Valitutti & Sherbrook, for their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, and states as follows:

1. In December of 2015, Plaintiff, Blue Cross Blue Shield of Michigan, and Defendant, Corizon Health Incorporated, signed an administrative services contract ("The Contract"), in which Plaintiff processed medical claims for incarcerated

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

individuals at Michigan correctional facilities serviced by Defendant. (**Exhibit A-Contract**)

2. Both parties performed under the Contract until September 29, 2021. After this time, Defendant stopped paying and the contract was not renewed. Prior to September of 2021, Corizon had been paying Plaintiff's invoices without objection.

3. Pursuant to the terms of the Contract, Defendant is responsible for reimbursing Plaintiff for all fees incurred prior to September 29, 2021, which is the date the termination became effective.

4. Plaintiff provided an Invoice to Defendant detailing the amount owed, which totals $3,410,136.51. (**Exhibit B- Invoice**)

5. As of early 2022, Defendant had yet to make any payments towards the amount owed.

6. Plaintiff mailed a demand letter to Defendant in March of 2022 detailing the amount due and owing. (**Exhibit C- Demand Letter**)

7. Defendant did not respond to this letter and did not object to the amount owed. As of today's date, Defendant has not provided any evidence to dispute the amount owed and has not made any payments towards the amount owed to Plaintiff.

8. Plaintiff filed its' Complaint in Macomb County Circuit Court on June 14, 2022 alleging breach of contract, account stated, and quantum meruit. (**Exhibit D-Complaint**)

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

3

9. Pursuant to MCL 600.2145 Plaintiff attached an Affidavit to its' Complaint, which detailed the amount due. A copy of the most recent invoice was also attached to the Affidavit. (**Exhibit E- Affidavit**)

10. Defendant removed this case to federal court and then filed an Answer on July 20, 2022. (**Exhibit F- Answer**)

11. Along with its' Answer, Defendant included the following three Affirmative Defenses (**Ex. F at p. 6**):

    a. Counts II and III fail to state a claim upon which relief may be granted because there is a valid contract in this matter that supersedes any quasi-contract claim for relief and the claims are not expressly pled in the alternative.

    b. Defendant did not engage in any unlawful, wrongful, negligent, fraudulent, or malicious conduct against Plaintiff is not liable to Plaintiff, and Plaintiff is not entitled to any relief or damages.

    c. Plaintiff's claims are barred, in whole or in part, by its own prior material breach of the contract between the parties, which excused further performance by Corizon.

12. Defendant did not provide any evidence or factual support for any of these Affirmative Defenses. (**Ex. F at p. 6**)

**Kitch Drutchas
Wagner Valitutti &
Sherbrook**
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

4

13. Furthermore, Defendant's only real defense as to the Account Stated claim is that "the amount demanded is not owed." (**Ex. F at p. 4 ¶ 27**)

14. Defendant claims the amount demanded is not owed; however, Defendant failed to attach an Affidavit to support this defense as is required under MCL 600.2145.

15. MCL 600.2145 also states, "Any affidavit in this section mentioned shall be deemed sufficient if the same is made within 10 days next preceding the issuing of the writ or filing of the complaint or answer". MCL 600.2145

16. The requisite time has passed and Defendant still has not provided an Affidavit or any evidence to support its' defenses.

17. In fact, Defendant failed to provide any evidence to support its' defenses along with its' Initial Disclosures and to date, has not provided any legitimate reason why it has failed to reimburse Plaintiff pursuant to the Contract.

18. Therefore, Plaintiff's Affidavit and corresponding invoice "shall be deemed prima facie evidence" of the debt owed to Plaintiff. MCL 600.2145

19. Under Fed. R. Civ. P. 56, summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

DET02:2554611.1

20. Here, MCL 600.2145 clearly and unambiguously sets forth the requirements for an Account Stated Claim under Michigan law as well as the proper manner in which a party can dispute an Account Stated claim.

21. Defendant has not provided an Affidavit as is required by Michigan law and has no evidence whatsoever to dispute the amount owed.

22. As is discussed at length in the attached brief, Plaintiff is entitled to judgment as a matter of law and requests that this Court grant this Motion and enter a judgment against Defendant in the amount of $3,410,136.51.

WHEREFORE, Plaintiff, Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court grant this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and enter a judgment against Defendant in the amount of $3,410,136.51.

Respectfully submitted,

KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

/s/ *Gabe Sybesma*
By:_____
　　Gabe Sybesma (P66632)
　　Paul Wilk Jr (P83691)
　　Attorneys for Plaintiff
　　One Woodward Avenue, Suite 2400
　　Detroit, MI 48226-5485
　　313-965-7848

Dated: November 29, 2022

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

       Plaintiff,

v

CORIZON HEALTH
INCORPORATED,

       Defendant.

Case No. 22-cv-11598

Hon. Mark A Goldsmith

_____ /

Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
Attorneys for Plaintiff
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
(313) 965-7848
gabe.sybesma@kitch.com
paul.wilk@kitch.com

Phillip C Korovesis (P40579)
Attorney for Defendant
150 W Jefferson, Suite 200
Detroit, MI 48226
(313) 225-7000
korvesis@butzel.com

_____ /

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

## **STATEMENT OF MATERIAL FACTS**

**1)** In December of 2015, Plaintiff, Blue Cross Blue Shield of Michigan, and Defendant, Corizon Health Incorporated, signed an administrative services contract ("The Contract"), in which Plaintiff processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Defendant. (**Ex. A**). Both parties performed under the Contract until Corizon terminated the Contract on September 29, 2021.

**2)** Plaintiff mailed a demand letter to Defendant in March of 2022 detailing the amount due and owing. Defendant ignored this demand letter and has not made payment. (**Ex. C**)

**3)** Plaintiff filed its Complaint in Macomb County Circuit Court on June 14, 2022 alleging breach of contract, account stated, and quantum meruit. (**Ex. D**)

**4)** Defendant filed an Answer and Affirmative Defenses on July 20, 2022. (**Ex. F**)

**5)** Defendant did not provide any evidence or factual support for any of its' Affirmative Defenses. (**Ex. F at p. 6**)

**6)** Furthermore, Defendant's only real defense as to the Account Stated claim is that "the amount demanded is not owed." (**Ex. F at p. 4 ¶ 27**) Defendant failed to attach an Affidavit to support this defense as is required under MCL 600.2145.

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

## <u>CONCISE STATEMENT OF THE ISSUES PRESENTED</u>

1. **WHETHER PLAINTIFF IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BASED UPON DEFENDANT'S FAILURE TO PROVIDE EVIDENCE DISPUTING THE DEBT OWED TO PLAINTIFF.**

**Kitch Drutchas
Wagner Valitutti &
Sherbrook**
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

## **CONTROLLING AUTHORITIES FOR THE RELIEF SOUGHT**

MCL 600.2145

*Keywell & Rosenfeld v Bithell*, 254 Mich. App. 300, 331; 657 N.W.2d 759 (2002)

*Exide Techs. v. Kmart Corp.,* No. 07-CV-11269, 2009 U.S. Dist. LEXIS 42618 (E.D. Mich. May 20, 2009)

*Klochko Equip. Rental CO. v. Vill. Green Constr*., No. 235599, 2003 Mich. App. LEXIS 1429 (Ct. App. June 17, 2003)

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

10

## **INTRODUCTION/STATEMENT OF FACTS**

In December of 2015, Plaintiff, Blue Cross Blue Shield of Michigan, and Defendant, Corizon Health Incorporated, signed an administrative services contract ("The Contract"), in which Plaintiff processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Defendant. (**Ex. A**) Plaintiff would receive claims for individuals incarcerated in the Michigan Department of Corrections system. Plaintiff would process and pay those claims pursuant the Contract with Corizon. Plaintiff would then invoice Corizon for the claims it paid on its behalf along with an administrative service fee.

Both parties performed under this contract until September 29, 2021. After this time, Defendant stopped paying and the contract was not renewed. Prior to September 2021, Corizon had been paying BCBSM's invoices without objection. Pursuant to the terms of The Contract, Defendant is responsible for reimbursing Plaintiff for all fees incurred prior to September 29, 2021, which is the date the termination became effective.

Plaintiff provided an Invoice to Defendant detailing the amount owed, which totals $3,410,136.51. (**Ex. B**) As of early 2022, Defendant had yet to make any payments towards the amount owed. Plaintiff mailed a demand letter to Defendant in March of 2022 detailing the amount due and owing. Defendant did not respond to

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

this letter and did not object to the amount owed. (**Ex. C**) Defendant did not respond to this letter and has not made any payments towards the balance owed.

Based upon Defendant's failure to respond to the demand letter, Plaintiff filed its' Complaint in Macomb County Circuit Court alleging breach of contract, account stated, and quantum meruit. (**Ex. D**) Pursuant to MCL 600.2145, Plaintiff attached an Affidavit to its' Complaint, which detailed the amount due. (**Ex. E**)

After removing this case to federal court based upon diversity jurisdiction, Defendant filed an Answer on July 20, 2022 and included the following three Affirmative Defenses:

    a. Counts II and III fail to state a claim upon which relief may be granted because there is a valid contract in this matter that supersedes any quasi-contract claim for relief and the claims are not expressly pled in the alternative.

    b. Defendant did not engage in any unlawful, wrongful, negligent, fraudulent, or malicious conduct against Plaintiff is not liable to Plaintiff, and Plaintiff is not entitled to any relief or damages.

    c. Plaintiff's claims are barred, in whole or in part, by its own prior material breach of the contract between the parties, which excused further performance by Corizon. (**Ex. F at p. 6**)

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

Defendant did not provide any evidence or factual support for any of these Affirmative Defenses. Furthermore, Defendant's only real defense as to the Account Stated claim is the statement "the amount demanded is not owed" (**Ex. F p. 4 ¶ 27**). In other words, Defendant claims the amount demanded is not owed; however, Defendant failed to attach an Affidavit to support this defense as is required under MCL 600.2145.

For that reason, Plaintiff's Affidavit and corresponding invoice shall be deemed as prima facie evidence of the debt owed to Plaintiff. MCL 600.2145 There is no dispute that Michigan law applies in this case and Michigan law clearly and unambiguously sets forth the requirements for an Account Stated Claim as well as the proper manner in which a party can dispute an Account Stated claim. Defendant failed to comply with Michigan statutory law and has no evidence whatsoever to dispute the amount owed. Therefore, Plaintiff is entitled to judgment as a matter of law and requests that this Court grant this Motion and enter a judgment against Defendant in the amount of $3,410,136.51.

## <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56(c) the Court may render summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

*Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003). If the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the nonmoving party. There must be evidence on which a jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 248, 252.

## **ARGUMENT**

### **I. Plaintiff is entitled to judgment as a matter of law due to Defendant's failure to provide evidence to dispute the account stated claim**

Here, there is no dispute that Michigan law applies to this matter, specifically to Plaintiff's Account Stated claim. Michigan Courts have defined an Account Stated claim as, "a balance struck between the parties…where a plaintiff is able to show that the mutual dealings which have occurred between the parties have been

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

adjusted, settled, and a balance struck, the law implies a promise to pay that balance." *Keywell & Rosenfeld v Bithell*, 254 Mich. App. 300, 331; 657 N.W.2d 759 (2002).

Under MCL 600.2145, when a plaintiff bringing an account stated claim makes an affidavit of the amount due and attaches to the affidavit a copy of the account and serves the defendant with the copy of the account, the affidavit, and the complaint, the affidavit "shall be deemed prima facie evidence of indebtedness, unless the defendant with his answer, by himself or agent, makes an affidavit and serves a copy thereof on the plaintiff or his attorney denying the indebtedness". MCL 600.2145. According to the Michigan Court of Appeals, a prima facie account stated claim may be established by:

> (1) serving the defendant with an affidavit of the amount due pursuant to M.C.L. § 600.2145, accompanied by proof that the defendant failed to file a counter-affidavit denying the debt; or (2) through evidence of an express understanding, or words and acts, and the necessary and proper inferences thereon. *Klochko Equipment Rental Co., Inc. v. Village Green Construction, L.L.C.*, No. 235599, 2003 Mich. App. LEXIS 1429, 2003 WL 21398305 (Mich. Ct. App. June 17, 2003) (citing *Keywell*, 254 Mich. App. at 331)

As is noted above, under Michigan law, MCL 600.2145 is not the only way to establish a claim for an account stated. The Michigan Court of Appeals has expanded upon this statute and held that such a claim, "can be proven through evidence of an express understanding, or words and acts, and the necessary and

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

proper inferences thereon." *Keywell* at 331. A plaintiff must prove that the defendant "expressly accepted bills tendered by paying them or failed to object to them within a reasonable time." *Id*.

This framework for an Account Stated claim under Michigan law was adopted by this Court in the case, *Exide Techs. v. Kmart Corp*., No. 07-CV-11269, 2009 U.S. Dist. LEXIS 42618 (E.D. Mich. May 20, 2009) (**Exhibit G**). In *Exide Techs.*, this Court denied plaintiff's motion for summary judgment due to the fact that plaintiff: (1) failed to serve a statutory Affidavit pursuant to MCL 600.2145; and (2) failed to provide evidence that defendant expressly accepted the amount owed by failing to object. *Exide Techs. v. Kmart Corp* at 19-20. The Court ruled that Exide's evidence was not comparable to that in the case, *Wilson v. White*, 223 Mich. 497, 500, 509-10, 194 N.W. 593 (1923), where defendants failed to <u>object to the billing practices</u> <u>over the course of a 15-year business relationship, and objected only to the</u> <u>accounting methods after the plaintiffs filed a lawsuit</u>. *Id*. (emphasis added) For that reason, plaintiff's Motion for Summary Judgment was denied. In other words, this Court accepted the Michigan Court's rulings that an affidavit or some type of documentary evidence is required when it comes to an Account Stated claim.

In the current case, Plaintiff served Defendant with an affidavit of the amount due pursuant to M.C.L. 600.2145. In fact, Defendant admitted that it received this Affidavit in its' Answer. (**Ex. F** ¶ 27). Defendant then denied that this amount was

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

the amount owed, but Defendant failed to file a counter-affidavit denying the debt. Therefore, this issue is quite simple and Plaintiff is entitled to judgment as a matter of law as Defendant failed to comply with MCL 600.2145 and has failed to provide an affidavit to establish a genuine issue of material fact.

This exact situation occurred in the Michigan Court of Appeals case, *Klochko Equip. Rental CO. v. Vill. Green Constr.*, No. 235599, 2003 Mich. App. LEXIS 1429 (Ct. App. June 17, 2003) (**Exhibit H**). While *Klochko*, is an unpublished case, it involves a very similar set of facts. In *Klochko*, the Court granted the plaintiff's motion based upon the defendant's failure to "submit an affidavit or other documentary evidence indicating that it objected to the amount owed in a reasonable time." *Klochko* at 9.

Here, Plaintiff has been billing Defendant in the same manner throughout the nearly 6-year life of the Contract. Then in 2021, Defendant stopped making payments, but provided no explanation. When Plaintiff sent a demand letter in March of 2022, Defendant ignored this letter. Plaintiff was forced to file suit and as in, *Wilson v. White*, 223 Mich. 497 (cited by this Court in *Exide Techs. v. Kmart Corp*), Defendant only objected to the amount owed after suit was filed.

In addition to the delay in objecting, Defendant failed to submit an affidavit or any documentary evidence whatsoever disputing the amount owed. Defendant waited until a lawsuit was filed and disputed the Account Stated claim by simply

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

17

stating it disputes the amount owed. Defendant has no factual support for this statement, which means that Defendant has no support for its' only defense to this claim. Therefore, Plaintiff has proven a prima facie Account Stated claim under both mechanisms outlined by the Michigan Court of Appeals and adopted by this Court when applying Michigan law. In conclusion, no genuine issue of material fact exists and Plaintiff is entitled to judgment as a matter of law under both, MCL 600.2145 and all relevant case law.

WHEREFORE, Plaintiff, Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court grant this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and enter a judgment against Defendant in the amount of $3,410,136.51.

Respectfully submitted,

KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

/s/ *Gabe Sybesma*

By:_____

Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
Attorneys for Plaintiff
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
(313) 965-7848

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

Dated: November 29, 2022

18

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

      Plaintiff,

v

CORIZON HEALTH
INCORPORATED,

      Defendant.

Case No. 22-cv-11598

Hon. Mark A Goldsmith

_____/

| | |
|---|---|
| Gabe Sybesma (P66632) | Phillip C Korovesis (P40579) |
| Paul Wilk Jr (P83691) | Attorney for Defendant |
| Attorneys for Plaintiff | 150 W Jefferson, Suite 200 |
| One Woodward Avenue, Suite 2400 | Detroit, MI 48226 |
| Detroit, MI 48226-5485 | (313) 225-7000 |
| (313) 965-7848 | korvesis@butzel.com |
| gabe.sybesma@kitch.com | |
| paul.wilk@kitch.com | |

_____/

**Kitch Drutchas
Wagner Valitutti &
Sherbrook**
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

19

## <u>DECLARATION OF SERVICE</u>

The undersigned certifies that on November 29, 2022 a copy of Plaintiff's Motion for Summary Judgment was served upon all attorneys/parties to the above cause by electronic filing with the Clerk of the Court using the E-File and E-Serve System which will send notification of such filing to the foregoing.

I declare under the penalty of perjury that the statement above is true to the best of my information knowledge and belief.

/s/ *Paul Wilk Jr*
Paul Wilk Jr

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

20

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

     Plaintiff,

v

CORIZON HEALTH
INCORPORATED,

     Defendant.

Case No. 22-cv-11598

Hon. Mark A Goldsmith

_____ /

| | |
|---|---|
| Gabe Sybesma (P66632) | Phillip C Korovesis (P40579) |
| Paul Wilk Jr (P83691) | Attorney for Defendant |
| Attorneys for Plaintiff | 150 W Jefferson, Suite 200 |
| One Woodward Avenue, Suite 2400 | Detroit, MI 48226 |
| Detroit, MI 48226-5485 | (313) 225-7000 |
| (313) 965-7848 | korvesis@butzel.com |
| gabe.sybesma@kitch.com | |
| paul.wilk@kitch.com | |

_____ /

## **PLAINTIFF'S APPENDIX**

    Kitch Drutchas Wagner Valitutti & Sherbrook
    Gabe Sybesma (P66632)
    Paul Wilk Jr (P83691)
    Attorneys for Plaintiff
    One Woodward Avenue, Suite 2400
    Detroit, MI 48226-5485

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue,
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

21

## <u>TABLE OF CONTENTS</u>

**EXHIBIT A-** Contract between BCBSM and Corizon

**EXHIBIT B-** Final Invoice to Corizon

**EXHIBIT C-** BCBSM Demand Letter

**EXHIBIT D-** BCBSM Complaint

**EXHIBIT E-** Affidavit of Yvonne Johnson

**EXHIBIT F-** Corizon's Answer and Affirmative Defenses

**EXHIBIT G-** *Exide Techs. v. Kmart Corp*., No. 07-CV-11269, 2009 U.S. Dist. LEXIS 42618 (E.D. Mich. May 20, 2009)

**EXHIBIT H-** *Klochko Equip. Rental CO. v. Vill. Green Constr*., No. 235599, 2003 Mich. App. LEXIS 1429 (Ct. App. June 17, 2003)

**Kitch Drutchas
Wagner Valitutti &
Sherbrook**
ATTORNEYS AND
COUNSELORS
ONE WOODWARD AVENUE,
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

# EXHIBIT A

> **Administrative Services Contract – Weekly Invoiced Program**
>
> **Corizon**

This Contract commences on ___December 1, 2015___ (the "Effective Date") and is made between Blue Cross Blue Shield of Michigan, a Michigan non-profit mutual insurance corporation, with offices at 600 Lafayette East, Detroit, Michigan 48226-2998 ("BCBSM") and _____Corizon_____ with offices at _105 Westpark Drive Suite 200, Brentwood, TN 37027_____ ("Group"), as the plan sponsor and administrator of its group health care plan ("Plan").

BCBSM and Group have agreed that BCBSM shall administer Claims processing for the Plan. This Contract sets forth the administrative responsibilities of BCBSM and Group's financial and other obligations with respect to BCBSM's role as a service provider to the Plan.

By entering into this Contract, Group and BCBSM hereby agree that, to the extent the Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), their relationship is that of Group as "Plan Fiduciary" and BCBSM as "Service Provider" as those terms are used in Department of Labor guidance including 29 C.F.R. §2550.408b-2.

BCBSM and Group agree as follows:

## ARTICLE I
## DEFINITIONS

A.  **"Amounts Billed"** means the amount that Group shall reimburse and pay BCBSM for Claims which have been processed and paid by BCBSM or another BCBS Plan under the terms of this Contract, Pharmacy Benefits if applicable, the Administrative Fee set forth in Schedule A, any Additional Administrative Compensation ("AAC") as set forth in Schedule A, Michigan Claims Tax, Pharmacy benefit fees as set forth in Schedule A, Health Care Provider Interest, and other fees and charges as set forth in Schedules A and B.

B.  **"BCBS Plan"** means a company that has been licensed by BCBSA other than BCBSM.

C.  **"BCBSA"** means the Blue Cross and Blue Shield Association.

D.  **"BlueCard Program"** means the national program established by BCBSA under which Enrollee Claims are processed by BCBS Plans when Enrollees receive health care services outside of the geographic area that BCBSM serves. BCBSA mandates the policies, procedures and disclosures of the BlueCard Program and amends them from time to time. Schedule B sets forth BCBSA's required disclosures for the BlueCard Program and is incorporated into this Contract. If BCBSA amends the disclosures, such amendments shall automatically become a part of this Contract upon BCBSM giving 60 days prior written notice to Group.

E.  **"Claim"** means a request for payment from a health care provider for a health care service provided to an Enrollee, with an incurred date for the service during the term of this Contract. Claims billed to Group include all amounts that BCBSM reimburses health care providers including both service-based and value-based reimbursement. BCBSM negotiates provider reimbursement rates on its own behalf and may set the rate for health care services to cover any BCBSM obligation to health care providers. BCBSM does not retain any portion of Claims as compensation. Provider reimbursement is governed by separate agreements with providers, BCBSM standard operating procedures for Claims, and BCBSM Quality Programs.

Claims received from an out-of-state BCBS Plan for a health care service provided to an Enrollee out-of-state are paid according to that BCBS Plan's health provider contracts and processed according to BlueCard Program standard operating procedures. Pursuant to the BlueCard Program, as described in Schedule B, out-of-state Claims may include a BlueCard Access Fee for processing the claim. Out-

1

of-state Claims are reported and billed to the Group as they are received by BCBSM from the out-of-state BCBS Plan.

F.    **"Contract"** means this Administrative Services Contract – Weekly Invoiced Program, as may be amended from time to time, and any Schedules, Parts, Exhibits and Addenda attached hereto and incorporated herein by reference.

G.    **"Contract Year"** means the period from the Effective Date to the first Renewal Date, or the period from one Renewal Date to the next Renewal Date. If termination occurs other than at the end of a Contract Year, Contract Year means that period from the Effective Date or the most recent Renewal Date through the date of termination.

H.    **"Coverages"** means the health care benefits set forth in Universal Group Application or Part C of the Group Enrollment and Coverage Agreement, which is incorporated into this Contract.

I.    **"Employee"** means the following which are eligible and enrolled for Coverage under the terms of the Plan or as required by law: (i) employees as designated by Group; (ii) retirees and their surviving spouses as designated by the Group; and (iii) COBRA beneficiaries.

J.    **"Enrollee"** means an individual that Group enrolled as an employee, spouse or dependent in the Plan pursuant to Article II.B, either as an Employee or as a dependent of an Employee.

K.    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, 29 USC 1101, *et seq*, and regulations promulgated thereunder.

L.    **"HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, as amended, Public Law 104 -191 of 1996, *et seq*, and regulations promulgated thereunder.

M.    **"IBNR Claims"** means Claims which are incurred during the term of this Contract, including during the Transition Assistance Period, but have not been reported to the Group as Amounts Billed or paid and which remain the Group's liability.

N.    **"PPACA"** means the Patient Protection and Affordable Care Act, as amended, Public Law 111-148 of 2010, *et seq*, and regulations promulgated thereunder.

O.    **"Quality Programs"** refer to BCBSM programs funded with value-based provider reimbursement. Quality Programs are governed by separate agreements with health care providers and are designed to improve health care outcomes and control health care costs.

P.    **"Renewal Date"** means the date one year after the Effective Date, and the same date of every subsequent year. The Renewal Date may be changed by mutual agreement of BCBSM and Group.

Q.    **"Transition Assistance Period (TAP)"** means a period of twenty-four (24) months after Termination has been effectively demanded under Article IV, during which BCBSM shall provide those services, and Group shall perform those obligations, set forth in Article IV, Section B.

## ARTICLE II
## GENERAL RESPONSIBILITIES

A.    Claims Administrator Status.

If the Plan is governed by ERISA, based on Group's disclosure of ERISA status in this Contract, Group hereby delegates to BCBSM the responsibility and discretionary authority as claims administrator to makes final benefit determinations and plan interpretations necessary to make those benefit determinations. BCBSM's claims administrator responsibilities extend only to the full and fair review of claims and administrative appeals as set forth in ERISA §433. By assuming these specifically delegated responsibilities as claims administrator, BCBSM does not thereby assume any other duty of the Group as Plan Administrator or any other fiduciary function Group performs on behalf of its Plan. Any determination or interpretation made by BCBSM pursuant to its claim determination authority is

binding on the Enrollee, Group, and BCBSM unless it is demonstrated that the determination or interpretation was arbitrary and capricious. Group retains all other fiduciary responsibilities and duties under ERISA not specifically delegated to BCBSM in this Contract.

BCBSM shall not be responsible for Group's failure to meet any of its financial obligations or Plan Administrator responsibilities with respect to the Plan.

B.   **Eligibility and Enrollment.**

Prior to the Effective Date, Group shall notify BCBSM of all Enrollees that will be covered by the Plan. During the term of this Contract, following agreed upon procedures, Group shall notify BCBSM of all changes in Plan enrollment. Until BCBSM has been properly notified of changes to Group's Plan enrollment, BCBSM shall continue to process Claims for Enrollees as listed on BCBSM's computer membership programs. Group represents and warrants that any eligibility and status changes it requests are compliant with and permissible under applicable state and federal law, including the PPACA; and, agrees that it will only request eligibility and status change requests that are compliant with and permissible under applicable state and federal law, including the PPACA.

C.   **Claims Processing.**

During the term of this Contract, requests for payment from Michigan providers will be directly submitted to BCBSM and shall be processed according to BCBSM's standard operating procedures for Claims. Requests for payment from out-of-state providers may, depending on the type of request for payment, be directly submitted to the appropriate out-of-state BCBS Plan and shall be processed pursuant to the BlueCard Program as set forth in Schedule B.

D.   **Disputed Claims.**

Group shall notify BCBSM in writing of any Claim that Group disputes within 60 days of Group's access to a paid Claims listing. BCBSM shall investigate such Claims and respond to Group within a reasonable time period. Upon BCBSM's request, Group shall execute any reasonably necessary documents that will allow BCBSM to recover any amounts that may be owed by a third party with respect to such disputed Claim. If BCBSM recovers any amount from a third party or if BCBSM determines that the disputed Claim is not Group's financial responsibility or is incorrect, then BCBSM shall give Group a credit for the recovered or corrected amount (reduced by any stop loss credits given by BCBSM relating to such disputed Claim).

E.   **Subrogation.**

BCBSM shall be subrogated to all of Group's, the Plan's, or an Enrollee's rights with respect to any Claim, however, BCBSM is not obligated to institute or become involved in any litigation concerning such Claim. BCBSM will use reasonable efforts to identify Claims in which the Group may have a subrogation or reimbursement interest. BCBSM will evaluate information provided by the Enrollee and other sources to determine whether a subrogation or reimbursement interest exists. BCBSM will not be obligated to undertake any such recovery litigation unless mutually agreed to by BCBSM and Group in writing. Absent written agreement, should Group elect to pursue such recovery litigation, BCBSM agrees to cooperate in Group's recovery efforts. BCBSM will remit to Group the funds recovered from third parties, less any expenses BCBSM has incurred in the recovery effort, including any attorney fees. BCBSM may assign or subcontract a portion of its duties under this provision of the Contract to third parties. Group will assist BCBSM or its assignee or subcontractor as reasonably necessary for BCBSM, its assignee, or subcontractor to carry out its duties under this provision.

Group authorizes BCBSM to act on behalf of Group and/or the Plan in any health care class action litigation of which BCBSM has knowledge, including but not by way of limitation, drug manufacturer and product liability litigation. BCBSM will take reasonable steps to notify Group of such class action litigation. Group will notify BCBSM if Group desires to independently pursue such litigation and BCBSM will reasonably cooperate with Group. As part of BCBSM's subrogation duties, BCBSM will use reasonable efforts to identify Claims that may be included in such class action litigation. BCBSM may institute and participate in such class action litigation, however, Group acknowledges that

ASC Weekly Invoiced Program – CID#   279476

BCBSM is not obligated to do so unless BCBSM and Group otherwise agree in writing. Group will reasonably cooperate with BCBSM with respect to any such litigation. BCBSM may assign or subcontract a portion of its duties under this provision to third parties. Group authorizes BCBSM to settle or compromise any litigation and BCBSM will remit to Group any funds recovered, less any expenses that BCBSM has incurred in participation of such class action litigation.

F.     **Litigation.**

If a third party initiates a claim, suit, or proceeding against the Plan, Group, or BCBSM relating to benefits payable under the Plan or any of the administrative services subject to this Contract ("Litigation"):

1.     Each party shall provide prompt written notice of the Litigation to the other party if served with such Litigation.

2.     Group may, with BCBSM's consent, request that BCBSM select counsel and defend litigation. BCBSM retains the right to deny this request and enforce Group's obligation to defend the Litigation.

3.     Whenever Group or BCBSM is a party in any Litigation, regardless of who is obligated to defend the litigation, Group and BCBSM each reserve the right, at its own cost and expense, to retain counsel to protect its own interests.

4.     Regardless of who is obligated to defend the litigation, Group and BCBSM shall reasonably cooperate with each other to provide all relevant information and documents within their respective control that are not subject to a privilege or confidentiality obligation; and to reasonably assist each other to defend, settle, compromise, or otherwise resolve the Litigation. Whenever either party is served with any Litigation, the party served shall take all steps necessary to prevent a default in the Litigation prior to determining which party will defend such Litigation.

5.     BCBSM shall have full authority to settle or compromise such Litigation, without Group's specific consent, unless:

     a.     $50,000 or more is at issue in the Litigation;
     b.     State tax issues or mandated benefit issues are part of the Litigation and Group has requested BCBSM to defend the Litigation; or
     c.     Settlement of the Litigation could have a material adverse impact on Plan costs or administration.

If Group's consent to settle or compromise Litigation is required, such consent shall not be unreasonably withheld. If Group withholds consent for any reason and the final resolution of the Litigation is equal to or greater than a settlement or compromise proposed by BCBSM, Group shall pay BCBSM the additional cost of any subsequent settlement, compromise or judgment including all of BCBSM's reasonable attorney fees and costs for proceeding with the Litigation.

6.     When Group is obligated to defend the Litigation, Group shall have full authority to settle or compromise such Litigation without BCBSM's consent, unless BCBSM has notified Group that the Litigation may have a material adverse impact on BCBSM.

If BCBSM's consent to settle or compromise Litigation is required, such consent shall not be unreasonably withheld. If BCBSM withholds consent for any reason and the final resolution of the Litigation is equal to or greater than a settlement or compromise proposed by Group, BCBSM shall pay the additional cost of any subsequent settlement, compromise or judgment including all of Group's reasonable attorney fees and costs for proceeding with the Litigation.

7.    When BCBSM defends the Litigation, the cost and expenses of such defense shall be paid by BCBSM.  The cost and expenses of such defense shall include reasonable attorney fees and other reasonable litigation costs, however, any settlement or payment of amounts that are the financial responsibility of Group, including but not limited to Claims, (via judgment, award, etc.) shall be paid by Group.

8.    Subject to paragraph 7 above, when the Group defends the Litigation, the cost and expenses of such defense shall be paid by Group.  The cost and expenses of such defense shall include reasonable attorney fees and other reasonable litigation costs and any settlement or payment for benefits or Claims shall be paid by Group.

G.    **Group Audits.**

Group, at its own expense, shall have the right to audit Claims incurred under this Contract; however, audits shall not occur more frequently than once every twelve months and shall not include Claims from previously audited periods or Claims paid prior to the last 24 months. Both parties acknowledge that Claims with incurred dates over two years old may be more costly to retrieve and that it may not be possible to recover over-payments for these Claims; however, BCBSM shall use best efforts to retrieve such Claims.

All audits shall be conducted pursuant to BCBSM corporate policy and other requirements at the time of the audit. The parties acknowledge staffing constraints may exist in servicing concurrent Group initiated audits.  Therefore after notice from Group requesting an audit, BCBSM will have 60 to 90 days, depending on scope and sample size, to begin gathering requested documentation and to schedule the on-site phase of the audit.

Sample sizes shall not exceed 200 Claims and shall be selected to meet standard statistical requirements (i.e., 95% Confidence Level; precision of +/- 3%).  Group shall reimburse BCBSM for Claims documentation in excess of 200 Claims at $50 per Claim.

Following the on-site activity and prior to disclosing the audit findings to Group, the auditor shall meet with BCBSM Management and present the audit findings.  BCBSM, depending upon the scope of the audit, shall be given a reasonable period of time to respond to the findings and provide additional documentation to the Auditor before the Auditor discloses the audit findings to the Group.

BCBSM shall have no obligation to make any payments in connection with audit findings to Group unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable.  No adjustments or refunds shall be made on the basis of the auditor's statistical projections of sampled dollar errors.   An audit error will not be assessed if the Claim payment is consistent with BCBSM policies and procedures, or consistent with specific provisions contained in this Contract or other written Group instructions agreed to by BCBSM.

Prior to any audit, Group and BCBSM must mutually agree upon any independent third party auditor that Group wishes to perform the audit.  Additionally, prior to audit, Group and any third party auditor shall sign all documents BCBSM believes necessary for the audit which will, at a minimum, provide for:  the scope of the audit; the costs for which BCBSM is to be reimbursed by Group; the protection of confidential and proprietary information belonging to BCBSM, and of any patient specific information; and the indemnification and hold harmless of BCBSM from any claims, actions, demands or loss, including all expenses and reasonable attorney fees, arising from any suit or other action brought by an individual or provider to the extent caused by Group or its auditor.

Group shall provide BCBSM with a copy of any internal audit or review of the services performed under any agreement with BCBSM.

H.   **Disclosures.**

Group shall disclose the following to Enrollees in writing:

1.   BCBSM services being provided.
2.   BCBSM does not insure any Enrollees.
3.   Group is responsible for the payment of Claims.
4.   Group is responsible for changes in Plan benefits.
5.   Group is responsible for enrollment.

I.   **Health Care Provider Interest.**

Group acknowledges that various states including Michigan have enacted prompt payment legislation with respect to the payment of Claims that may require the payment of interest to providers under circumstances dictated by statute. BCBSM will invoice the Group for any interest required by statute and Group shall pay such interest. Additionally, out-of-state Claims may be inclusive of any interest owed by statute or required by the terms of provider contracts with the out-of-state BCBS Plan. Out-of-state Claims are reported and billed to Group as submitted to BCBSM by the out-of-state BCBS Plan.

J.   **Confidentiality.**

The terms of this Contract and the items set forth below are confidential and shall not be disclosed or released to a third party without the prior written consent of BCBSM, unless required by law.

1.   Claim Information
Enrollee personal or individually identifiable health information.

2.   Provider Proprietary Information
Health care provider names, addresses, tax identification numbers, and financial amounts paid to such providers.

3.   BCBSM and Other BCBS Plan Proprietary Information
BCBSM's or any other BCBS Plan's methods of reimbursement, amounts of payments, discounts and access fees; BCBSM's administrative fees and, if applicable, stop loss fees; those processes, methods, and systems developed for collecting, organizing, maintaining, relating, processing and transacting comprehensive membership, provider reimbursement and health care utilization data.

K.   **Amounts Billed.**

1.   Claims:

The Claims billed to Group include both service-based and value-based reimbursement to health care providers. Group acknowledges that BCBSM's negotiated reimbursement rates include all reimbursement obligations to providers including provider obligations and entitlements under BCBSM Quality Programs. Service-based reimbursement means the portion of the negotiated rate attributed to a particular health care service. Value-based reimbursement is the portion of the negotiated reimbursement rate attributable to BCBSM Quality Programs, as described in the Exhibit to Schedule A.

BCBSM negotiates provider reimbursement rates and settles provider obligations on its own behalf, not Group. Through this contract, Group receives the benefit of BCBSM provider rates, but it has no entitlement to a particular rate or to unbundle the service-based or value-based components of Claims. BCBSM does not retain any portion of Claims as compensation. All amounts collected from Group in Claims are used to satisfy provider obligations. Group agrees to pay Claims as defined herein.

Out-of-state Claims processed through the BlueCard Program, shall be calculated according to the BlueCard Program policies and procedures, as set forth in Schedule B.

6

ASC Weekly Invoiced Program – CID# 279476

2.   <u>Additional Administrative Compensation:</u>

Group shall pay Additional Administrative Compensation ("AAC") as set forth in Schedule A unless the Group has elected a Full Fixed Administrative Fee in lieu of AAC. AAC is calculated as a percentage of BCBSM discounts on Michigan hospital Claims with a cap and floor as set forth in Schedule A.

3.   <u>Health Care Provider Interest:</u>

See Article II.I.

4.   <u>Taxes and Surcharges:</u>

State and Federal governments may impose surcharges or taxes on Claims.  The State of Michigan imposes a tax on all Michigan Claims for Michigan residents. Tax rates are governed by applicable law.

Such surcharges or taxes, where imposed by law, may be invoiced to Group or billed and reported to Group in Claims. Group agrees to pay all such surcharges or taxes.

5.   <u>Pharmacy Benefits Services:</u>

If Group elects BCBSM pharmacy benefits, Amounts Billed shall include pharmacy Claims and any claims processing, pharmacy fees, and rebate processing fees set forth in Schedule A.

6.   Amounts Billed shall also include any fee or charge identified in Group's Schedule A, including but not limited to Group's Administrative Fee.

L.   **Coordination with Medicare.**

Group shall timely notify BCBSM whether Medicare is the primary payer for Claims of any Enrollee. BCBSM shall change such Enrollee's eligibility record within 15 business days of BCBSM's receipt of Group's notice. Group shall indemnify and hold harmless BCBSM for any claim, demand, judgment, penalty or other liability that arises out of Group's failure to provide timely notice to BCBSM.

M.   **Pharmacy Benefits.**

To the extent Group has engaged BCBSM to administer prescription drug claims for its Plan, BCBSM or its subcontractor shall process all prescription drug claims according to Group's benefit design and BCBSM's participating pharmacy contracts.

Group acknowledges that payments to participating pharmacies may include prescription drug costs, dispensing fees, and incentive fees for dispensing a generic drug or compounding a prescription drug.

Group authorizes BCBSM to act and serve as Group's exclusive agent for the purpose of negotiating with and obtaining rebates from pharmaceutical manufacturers.  Group understands and agrees that BCBSM may directly contract with pharmaceutical manufacturers or BCBSM may contract with various subcontractors that have contracts with pharmaceutical manufacturers.  BCBSM's rebate administrators retain a portion of the total rebates collected from drug manufacturers as a rebate administration fee.  BCBSM will pass on to Group rebates net of rebate administration fees. If BCBSM receives rebate adjustments or de minimis amounts of unidentifiable rebates that cannot practicably be tied to particular claims, BCBSM will proportionally allocate those rebate amounts to customers with pharmacy benefits.

Pharmacy administration fees and rebate administration fees are set forth in Schedule A.

7

ARTICLE III
FINANCIAL RESPONSIBILITIES

A.   **Group Responsibilities.**

Group shall be liable for all risks, financial obligations, Amounts Billed, fees, and interest set forth in this Contract, including Schedules A, B, and C. Group shall also be liable for any statutory court costs and attorney's fees awarded by a court to Enrollees, and all other liabilities which BCBSM may assume or which might otherwise attach with respect to the administration of Coverages pursuant to this Contract, including Schedules A, B, and C. Group shall make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations, and liabilities.

B.   **Scheduled Payments by Group.**

Group shall make payments of amounts due and owing as set forth on Schedule A, including, but not by way of limitation, (1) administrative fee per Employee and additional administrative compensation, if any; (2) the hospital advance; and (3) Amounts Billed.

C.   **Interest.**

Pursuant to the instructions in Schedule A, Group shall pay the Estimated Weekly Payment to a designated BCBSM bank account, which funds other BCBSM accounts. To the extent any of those bank accounts are interest bearing, BCBSM retains any interest earned and will not pay or credit any interest to Group. Additionally, banks holding BCBSM accounts may retain float interest earned on transactions with the funds in those accounts.

D.   **Schedule A Renewals.**

Thirty (30) days prior to each Renewal Date, BCBSM shall send Group a Schedule A for the new Contract Year with all pricing terms, including BCBSM's administrative fee, applicable AAC, interest rates, and any new Michigan hospital advance. Such Schedule A may specify the pricing terms for a single Contract Year or, with the agreement of BCBSM and Group, may specify the pricing terms for multiple Contract Years. The renewal term Schedule A as received by the Group shall be considered fully executed and effective on the Renewal Date unless the Group notifies BCBSM prior to the Renewal Date that the contract will not be renewed.

E.   **Group's Weekly Wire and Other Payments.**

Group shall make weekly payments of all amounts due to BCBSM within one business day of the payment day set forth in the Schedule A. In addition, Group shall pay to BCBSM any separately invoiced amounts within fifteen (15) days of invoice or settlement receipt. If Group's payment for any amount payable under this Contract is more than one business day late, Group shall pay a late fee of the lesser of two percent of any outstanding amount due or the maximum amount permitted by law. In addition, BCBSM may cease to process Claims retroactive to the last date for which full payment was made.

F.   **Settlements.**

1.   Annual Settlements. Group shall receive its Annual Settlement approximately one hundred twenty (120) days after the end of each Contract Year, which may include a reconciliation of the administrative fee based on BCBSM's enrollment records for the Contract Year at the time the reconciliation is performed. Because reconciliation of Group's hospital Claims depends on BCBSM's final settlement with the hospitals, a separate settlement process called CSR, explained below, captures that reconciliation.

If the Group has an arrangement whereby it pays AAC, the total AAC reported to Group with the Annual Settlement equals the total amount of AAC collected from Group during the year in Amounts Billed less any AAC that was refunded to Group pursuant to a stop-loss insurance policy

8

with BCBSM.  If the total AAC exceeds the maximum AAC set forth in Schedule A, BCBSM shall return the excess AAC to Group.  If the total AAC is less than the minimum AAC set forth in Schedule A, Group shall pay BCBSM the shortfall. Neither Group nor BCBSM shall pay any interest on these payments/refunds.

2.  <u>Customer Savings Refund</u>.  Customer Savings Refund (CSR) is the annual report reconciling Group's Amounts Billed during the 12-month period 7/1 – 6/30 with any of the following items settled during the same period:  (1) retroactive adjustments made in the Michigan Hospital Settlement (MHS), explained below, (2) drug rebates received pursuant to Group's Pharmacy Benefits arrangement, (3) class action recoveries, and (4) any other settlements from litigation and provider audits for which claim readjudication is not practicable.

If a refund is due, Group will receive a CSR payment in the year following the close of the CSR period.  In the case of a liability resulting from the MHS, the liability will be reported to Group in the year following the close of the CSR period.  A liability will accumulate with interest and be offset against future CSR payments. BCBSM may in its sole discretion elect not to offset any MHS liability against some or all drug rebates.

MHS liabilities will continue to accumulate from year to year unless Group elects to pay the liability or CSR payments in subsequent years exceed the amount of Group's outstanding MHS liability.  BCBSM may in its sole discretion invoice Group for some or all of Group's CSR liability, which invoice shall be paid within thirty (30) days of receipt by Group.

The MHS is designed to reconcile amounts BCBSM paid to a hospital during a year with the total amount of reimbursement due to the hospital.  Pursuant to separate agreements between BCBSM and Michigan hospitals, BCBSM makes periodic estimated payments to each hospital based on expected claims for all BCBSM customers.  At the end of the contract year with the hospital, BCBSM settles the amount the hospital received in payments with actual claims experience, hospital reward and incentive payments under Quality Programs, and hospital obligations to Quality Programs. The MHS will result in a gain or loss applied to Group's CSR.

Group will not receive a CSR or incur adjusted liability attributable to a particular hospital until after the finalization of the MHS for a particular hospital.  Group's refund or liability attributable to a particular hospital gain or loss, respectively, is proportionate to Group's utilization for that hospital.

G.  **Changes in Enrollment or Coverages – Effect on Pricing Terms.**

If there is more than a 10 percent (10%) change in the number of Enrollees from the number stated in Schedule A during any month of the Contract Year or a change in Coverages, BCBSM may immediately revise any affected pricing terms in the Schedule A to reflect such changes in Enrollment and/or Coverages.  Any revisions will be effective beginning with the next month following thirty (30) day notification by BCBSM to the Group.  The revised Schedule A will be treated as executed by Group and effective as of the date it is received by Group.

**ARTICLE IV**
**TERMINATION AND TERMINATION ASSISTANCE**

A.  **Termination & Notice.**

1.  <u>With or Without Cause.</u>  Either party may with or without cause provide notice of intent to terminate this Contract by giving written notice to the other party.  For the ninety (90) days following such written notice, each Party's obligations and entitlements will remain unaltered. At the conclusion of this ninety (90) day notice period, no claims with service dates following the conclusion of the ninety (90) day notice period will be approved and the Transition Assistance Period ("TAP") will begin, which will conclude 24 months later, at which time the contract will be terminated.

ASC Weekly Invoiced Program – CID#  279476

2. <u>Nonpayment, Partial Payment, Insolvency, or Bankruptcy.</u> Notwithstanding any other Contract provisions, if Group fails to timely pay any amounts owed or becomes insolvent or files for bankruptcy protection, BCBSM may at its option, after giving five (5) days notice in writing, cause the contract to immediately enter the TAP.

3. <u>Termination within the First Contract Year.</u> If Group gives notice of termination of the Contract before the end of the first Contract Year or if BCBSM terminates the contract under paragraph (2.) before the end of the first Contract Year, Group's total administrative fee liability to BCBSM shall be twelve months of administrative fees at the rate stated in Schedule A in order to compensate BCBSM for the costs of setting up and implementing the arrangement. Group's termination liability for administrative fees shall be determined using the average monthly enrollment prior to termination times twelve months, and shall be net of administrative fees paid prior to termination.

B. **Transition Assistance Period.**

Once written notice of termination has been given under Section A of this Article and the notice period has expired, the parties will continue to perform, and this Contract will continue, with respect to each party's obligations related to the wind-down of this Contract as set forth in this Section for the TAP. Upon the expiration of the TAP, this Contract shall terminate. The date on which the applicable notice period has expired following a termination trigger and on which the TAP commences will be called the "TAP Effective Date."

1. <u>End of Coverage.</u> Notwithstanding any other provisions contained herein, neither BCBSM nor any BCBS Plan shall have any obligation for payment for any health care services which are incurred after the TAP Effective Date.

2. <u>Obligation to Pay.</u> Notwithstanding any other provisions contained herein, Group's obligation to pay amounts incurred under the Contract shall survive during the TAP, and Group shall continue to timely pay all amounts owed. All Claims incurred prior to the TAP Effective Date, but not paid before that date, shall be processed by BCBSM or other BCBS Plans pursuant to the terms and conditions in this Contract and separate agreements with providers. Group agrees that it shall have no right to have any Claims incurred before the TAP Effective Date processed by a replacement carrier or administrator.

BCBSM retains the right to cease paying Claims if, during the TAP, Group fails to timely pay BCBSM for Amounts Billed and/or if Group is insolvent and/or files for bankruptcy protection. Group represents and warrants that it understands that it will be solely liable for any Claims BCBSM does not pay as a result of Group's failure to make timely payment to BCBSM, and Group will indemnify, defend, and hold BCBSM harmless for any Litigation or other adversary proceeding brought by an Enrollee whose claim was not paid by BCBSM as a result of Group's failure to timely pay BCBSM. This paragraph is independent of BCBSM's rights under Art. IV.A.2.

3. <u>Claim Payments.</u> For the first three (3) months following the TAP Effective Date, Group shall make weekly payments in the same manner as prior to the TAP Effective Date; however, Group shall pay the fixed administrative fee for only the first two months after the TAP Effective Date. AAC, if any, will continue to be paid for the TAP. For the next twenty-one (21) months, BCBSM will invoice Group each month and Group shall make payments to BCBSM. After six months from the TAP Effective Date, BCBSM shall offset any Amounts Billed against the Michigan hospital advance.

4. <u>Settlement-Last Contract Year.</u> Within one hundred eighty (180) days following the TAP Effective Date, BCBSM shall prepare a settlement statement for the last Contract Year. Such settlement statement shall include any compensation to BCBSM, including administrative fees.

5. <u>Interest.</u> If the total amount of the estimated Amounts Billed included in the weekly payments made during the first three (3) month period following termination exceed the actual Amounts Billed during the period, BCBSM will pay the Group interest at the then rate for short term government treasury bonds (STIGB), which is currently calculated as a rolling twelve-month

10

average of the 90-day T-Bill yield rate on the average monthly balance of any excess. The total amount of any excess will be included in the settlement for the last Contract Year.

6. <u>Final Settlement.</u> Within ninety (90) days after the expiration of the Transition Assistance Period, BCBSM will prepare a final settlement and will refund any positive balance or invoice Group for any negative balance. Any negative balance will be due within ten (10) days of the date of invoice. The payment to Group or to BCBSM as provided in the immediately preceding sentence shall fully and finally settle, release, and discharge each party from any and all claims that are known, unknown, liquidated, non-liquidated, incurred-but-not-reported, adjustments, recoupments, receivables, recoveries, rebates, hospital settlements, and other sums of money due and owing between the parties and arising under this Contract.

7. <u>Group Duty to Notify/Indemnity.</u>   Group shall notify BCBSM if, as a result of its insolvency or other status, another party is required by law to receive any refunds, payments, or returned funds from BCBSM under this Article IV. Group shall indemnify, defend, and hold BCBSM harmless for any liability, including attorney fees, resulting from Group's failure to notify BCBSM under this paragraph.

C.    **Conversion to Underwritten Group.**

If Group converts from a self-funded group to a BCBSM underwritten group, Group shall continue to be obligated for any balance due and Group shall timely pay the amounts due and owing under this Contract in addition to any premium payments as a BCBSM underwritten group.

**ARTICLE V**
**GENERAL PROVISIONS**

A.    **Entire Agreement.**

This entire Contract, including Schedules, represents the entire understanding and agreement of the parties regarding matters contained herein. This Contract supersedes any prior verbal or written agreements and understandings between the parties and shall be binding upon the parties, their successors or assigns.

B.    **Indemnity.**

Group agrees to indemnify, defend and hold BCBSM harmless from any claims resulting from Group's breach of any term of this Contract and/or breach of any obligation or duty not expressly delegated to BCBSM in this Contract, including, but not limited to, Group's obligation to manage enrollment, to disclose Plan information to Enrollees, to respond to requests for Plan documents, and to read and understand the terms of this Contract.

The indemnity and hold harmless provisions of this Contract shall survive the termination of the Contract.

C.    **Service Mark Licensee Status.**

BCBSM is an independent licensee of BCBSA and is licensed to use the "Blue Cross" and "Blue Shield" names and service marks in Michigan. BCBSM is not an agent of BCBSA and, by entering into this Contract, Group agrees that it made this Contract based solely on its relationship with BCBSM or its agents. Group agrees that BCBSA is not a party to this Contract, has no obligations under this Contract, and that no BCBSA obligations are created or implied under this Contract.

D.    **Notices.**

Unless otherwise provided in this Contract, any notice required shall be given in writing and sent to the other party either by hand-delivery, electronic mail message to designated representative of the

other party, or postage pre-paid US first class mail at the following address or such other address as a party may designate from time to time.

If to Group:                                   If to BCBSM:

Current address shown on                       Blue Cross Blue Shield of Michigan
BCBSM Group Header                             600 Lafayette East, Mail Code B612
                                               Detroit, Michigan 48226-2998

E.   **Amendment.**

This Contract may be amended only by a written agreement duly executed by authorized representatives of each party provided, however that this Contract may be amended by BCBSM upon written notice to Group in order to facilitate compliance with applicable law including changes in regulations, reporting requirements or data disclosure as long as such amendment is applicable to all BCBSM groups that would be similarly affected by the legal change in question. BCBSM will provide thirty (30) calendar days notice of any such amendment and regulatory provision, unless a shorter notice is necessary in order to accomplish regulatory compliance.

Upon request by Group BCBSM will consult with Group regarding the regulatory basis for any amendment to this Contract as a result of regulatory requirements.

F.   **Severability.**

The invalidity or nonenforceability of any provision of this Contract shall not affect the validity or enforceability of any other provision of this Contract.

G.   **Waiver.**

The waiver by a party of any breach of this Contract by the other party shall not constitute a waiver as to any subsequent breach.

H.   **Law.**

This Contract is entered into in the State of Michigan and, unless preempted by federal law, shall be construed according to the laws of Michigan. Group agrees to abide by all applicable state and federal law.  Group agrees that, where applicable, the federal common law applied to interpret this Contract shall adopt as the federal rule of decision Michigan law on the interpretation of contracts. .

I.   **HIPAA.**

1.       **Group Certification.**

Group certifies that it is the Plan Sponsor and Plan Administrator, performs Plan administration functions, needs access to Enrollee protected health information to carry out such administration functions, and has amended the Plan documents to comply with the requirements of 45 CFR 164.504(f)(2). BCBSM is therefore authorized to provide Group with the minimum necessary Enrollee protected health information for Group to perform its plan administration functions.

2.       **Business Associate Agreement.**

The parties shall enter into a business associate agreement.

J.   **Force Majeure.**

Neither BCBSM nor Group shall be deemed to have breached this Contract or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Contract if

12

prevented from doing so by acts of God or the public enemy, fires, floods, storms, earthquakes, riots, strikes, boycotts, lock-outs, wars and war-operations, restraints of government, power or communication line failure, judgment, ruling, order of any federal or state court or agency of competent jurisdiction, change in federal or state law or regulation subsequent to the execution of this Contract, or other circumstances beyond the party's reasonable control for so long as such "force majeure" event reasonably prevents performance.

K. **Group Disclosure of Other Coverage Vendors.**

Group agrees that, to the extent that BCBSM does not administer all of Plan's "essential health benefits," as that term is defined by the PPACA, Group shall identify for BCBSM all those vendors ("Vendors") that are also providing or administering essential health benefits to the Plan's participants, the benefits the Vendors are providing to them, the number of participants receiving such benefits, and the cost sharing arrangements for such benefits.

In addition, Group shall cause its officers, directors, employees, and representatives and Vendors' officers, directors, employees and representatives to fully and timely cooperate with BCBSM and provide it with the necessary information for BCBSM to ensure its compliance and that of the Plan with PPACA to the extent BCBSM is obligated to do so by law or by contract. This information includes, but is not limited to, social security numbers or other forms of government identification numbers of each Plan participant and beneficiary.

Group is solely responsible to ensure Group's maximum out-of-pocket amount is in compliance with PPACA. If BCBSM agrees to assist Group in determining whether Group's maximum out-of-pocket amount is in compliance with PPACA, then Group authorizes all Vendors to, and shall inform the Vendors in Group's contract with them that they must, effective on the beginning of the Group's first plan year on or after January 1, 2014, disclose to BCBSM on a daily basis (or some other regularly scheduled period as determined by BCBSM) all claims data for the essential health benefit(s) of Plan participants and beneficiaries that they possess.

L. **Other Data Requirements.**

Group agrees to provide to BCBSM all data reasonably necessary for BCBSM to comply with the requirements of PPACA or other applicable federal or state laws. Such data includes, but is not limited to, all Enrollee data needed to comply with any reporting or other requirements of PPACA, *e.g.*, the employer's share of any premium and social security or tax identification numbers. Group certifies that if it fails to provide all the data requested and if it has provided such information to BCBSM in response to a previous request, then Group shall be deemed to have certified to BCBSM that such information previously supplied remains correct and can be relied upon.

Group and Group's Vendors will maintain relevant books, records, policies, procedures, internal practices, and/or data logs relating to this Contract in a manner that permits review for a period of seven (7) years or (ten (10) years in the case of Medicare/Medicaid transactions) after the expiration of this Contract. With reasonable notice and during usual business hours, BCBSM, or its designated third party (with appropriate confidentiality obligations), may audit those relevant books, records, policies, procedures, internal practices, and/or data logs of Group and/or its Vendors, as necessary, to verify calculations related to the imposition of any taxes and fees under PPACA or other federal or state laws and to ensure compliance with this Contract and any applicable federal and state laws. Group shall cooperate with BCBSM in all reasonable respects in connection with such audits.

BCBSM's failure to detect, failure to notify Group of detection, or failure to require Group's remediation of any unsatisfactory practices does not relieve Group of its responsibility to comply with this Contract or applicable law, does not constitute acceptance of such practice, and does not constitute a waiver of BCBSM's enforcement rights under this Contract or applicable law.

If Group conducts, or contracts to have conducted, an internal audit or review of the services performed under any agreement with BCBSM, Group shall provide BCBSM with a copy of such audit or review within thirty (30) days of BCBSM's written request. This also applies to audits/reviews performed by or at the request of any federal or state regulatory agencies of BCBSM services. The

13

selection of an independent auditor by Group to conduct an internal audit of Group does not preclude BCBSM from conducting an audit in accordance with the terms contained herein.

The provisions of this Section shall survive the termination of this Contract.

M.  **Grandfather Status; Women's Preventative Care Religious Exemption.**

Group acknowledges and agrees that unless a written certificate of grandfather status and indemnity in form and substance satisfactory to BCBSM was previously provided to BCBSM by Group or, for a Group new to BCBSM as of January 1, 2013, was provided to and accepted by BCBSM concurrently with the signing of this Contract, Group will be considered non-grandfathered for all purposes.

In addition, Group acknowledges that the health care coverages provided to its Enrollees will include recommended women's preventive health services without cost sharing (as required by PPACA) unless the Plan (i) is a grandfathered group health plan that has not provided such coverage or (ii) qualifies as either an exempt group health plan or one eligible for the temporary safe harbor under PPACA and has provided a certificate to that effect in form and substance satisfactory to BCBSM.

N.  **Summary of Benefits and Coverage.**

Group is solely responsible for compliance with the federal Summary of Benefit and Coverage (SBC) rules, including SBC creation and distribution. BCBSM does not assume any responsibility for SBC rule compliance relating to the Plan, or for creation or disclosure of compliant SBCs. BCBSM disclaims any liability or responsibility for any non-compliance by Plan with SBC rules and regulations relating to creation, disclosure or other requirements.

O.  **Plan Year.**

Group's Plan Year, as that term is defined in PPACA, is the one year period beginning on the Effective Date and ending one year (or less) later on the last day of the month immediately preceding the month in which the Effective Date falls ("Effective Date Month").  Each Plan Year thereafter shall begin on the first day of the Effective Date Month and end one year later.

If Group's Plan Year that is not consistent with that reflected in the preceding paragraph, Group will promptly notify BCBSM in writing.  Group will notify BCBSM at least six months in advance of any change in the Plan Year.

P.  **Knowing Assent.**

Group acknowledges that it has had full opportunity to consult with such legal and financial advisors as it has deemed necessary or advisable in connection with its decision knowingly to enter into this Contract. Group acknowledges that it is its obligation as Plan Fiduciary to determine whether the financial arrangements set forth in this Contract and Schedules are an appropriate Plan expense and for the exclusive benefit of the Plan.  Group acknowledges that it has had any questions about this Contract posed to BCBSM fully answered to Group's satisfaction.

Neither party has executed this Contract in reliance on any representations, warranties, or statements other than those expressly set forth herein.

Q.  **Group Health Plan Type; Attestation.**

Is Groups' Plan governed by ERISA?  ☐ Yes.  ☒ No.

Group attests that, to the best of its knowledge, this response is correct and acknowledges that BCBSM will rely on this response to determine requirements applicable to Group and the performance of this Contract.

AGREED AND ACCEPTED.

| BCBSM: | | GROUP: | |
|---|---|---|---|
| By: *~signature~* (Signature) | | By: *~signature~* (Signature) | |
| Name: *Yvonne Moore* (Print) | | Name: *M. Therese Brumfield* (Print) | |
| Title: *Asst Mgr.* | | Title: *VP, Provider Operations* | |
| Date: *5/24/16* | | Date: *5-23-16* | |

| By: *~signature~* (Signature) | | By: (Signature) | |
|---|---|---|---|
| Name: *Gary R. Gavin* (Print) | | Name: (Print) | |
| Title: *VP, KLGRD* | | Title: | |
| Date: *6-16-16* | | Date: | |

ASC Weekly Invoiced Program – CID#

# EXHIBIT B



**Blue Cross
Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

| | | | |
|---|---|---|---|
| **Group Name** | CORIZON HEALTH, INC. | **Invoice Due Date** | 05/01/2022 |
| **Group Number** | 000071499 | **Invoice Date** | 04/12/2022 |
| **Invoice Number** | 141444768 | **Invoice Type** | MONTHLY INVOICED |
| **Total Balance Due** | $3,410,136.51 | **Bill Period** | 03/01/2022-03/31/2022 |

### Previous Invoice Summary

| | |
|---|---|
| Previous Balance | $3,376,244.91 |
| Balance Forward | $3,376,244.91 |

### Claim Summary

| Utilization Summary | Unit | Current Charges |
|---|---|---|
| Facility - Cases | 44 | $1,225.70CR |
| Professional - Clm | 115 | $35,024.65 |

### Taxes and Fees Summary

| Fee Type | Rate | Unit | Total |
|---|---|---|---|
| BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP | | | $92.65 |
| ADVANCE DEPOSIT | | | $0.00 |

### Total Charges Summary

| | |
|---|---|
| Total Current Charges | $33,891.60 |
| Total Balance Due | $3,410,136.51 |

Non-payment of this bill will result in cancellation of this policy retroactive to the last date for which full payment was made.

If there are questions concerning this invoice, contact Group Customer Inquiry and Billing Dept.
Phone: 1-800-446-5251   Email: ascbilling@bcbsm.com

Payment Options:
Wire Payment

# EXHIBIT C

March 18, 2022

Jeff Sholey
Isaac Lefkowitz
Corizon Health, Inc.
105 Westpark Drive, Suite 200
Brentwood, TN 37027

      Re:     Payment of Outstanding Balance Owed to BCBSM

Dear Mr. Sholey and Mr. Lefkowitz:

Corizon Health, Inc. and Blue Cross Blue Shield of Michigan were parties to an administrative services contract ("ASC"), effective December 1, 2015, in which BCBSM processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Corizon. As a result of Corizon's loss of a servicing contract with the state of Michigan, Corizon terminated the ASC with a termination effective date of September 30, 2021. Pursuant to the terms of the ASC, Corizon is responsible for reimbursing BCBSM for all claims incurred by incarcerated individuals prior to September 30, 2021 and paying BCBSM administrative fees for processing such claims. As of the date of this letter, the total balance owed by Corizon is $3,359,102.28 per the attached invoice.

BCBSM demands that Corizon make full payment of the outstanding balance owed by March 31, 2022. If BCBSM does not receive payment by this date, BCBSM will pursue all rights and legal remedies, including litigation, to recover this amount. In addition, BCBSM will notify the Michigan Department of Technology and the Michigan Department of Corrections of Corizon's failure to pay amounts owed.

Sincerely,

Robert Fine
Assistant General Counsel
Blue Cross Blue Shield of Michigan
rfine@bcbsm.com

cc: Jason Helling; Yvonne Johnson

Enclosures

**Blue Cross**
**Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

| | | | |
|---|---|---|---|
| **Group Name** | CORIZON HEALTH, INC. | **Invoice Due Date** | 03/01/2022 |
| **Group Number** | 000071499 | **Invoice Date** | 02/10/2022 |
| **Invoice Number** | 138326093 | **Invoice Type** | MONTHLY INVOICED |
| **Total Balance Due** | $3,359,102.28 | **Bill Period** | 01/15/2022-01/31/2022 |

### Previous Invoice Summary

| | |
|---|---|
| Previous Balance | $3,229,610.76 |
| Balance Forward | $3,229,610.76 |

### Claim Summary

| Utilization Summary | Unit | Current Charges |
|---|---|---|
| Facility - Cases | 16 | $2,472.79 |
| Professional - Clm | 33 | $12,308.22 |

### Taxes and Fees Summary

| Fee Type | Rate | Unit | Total |
|---|---|---|---|
| CUSTOMER SAVINGS REFUND - CANCELLED GRO | | | $113,824.10 |
| BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP | | | $886.41 |
| ADVANCE DEPOSIT | | | $0.00 |

### Total Charges Summary

| | |
|---|---|
| Total Current Charges | $129,491.52 |
| Total Balance Due | $3,359,102.28 |

Non-payment of this bill will result in cancellation of this policy retroactive to the last date for which full payment was made.

If there are questions concerning this invoice, contact Group Customer Inquiry and Billing Dept.
Phone: 1-800-446-5251    Email: ascbilling@bcbsm.com

# EXHIBIT D

Approved, SCAO

| | | |
|---|---|---|
| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |

**STATE OF MICHIGAN**

Macomb County

JUDICIAL DISTRICT
JUDICIAL CIRCUIT
COUNTY PROBATE

**SUMMONS**

**CASE NO.**

22-002172-CB

**Court address**
40 North Main St., Mount Clemens, MI 48043

**Court telephone no.**
586-469-7171

Plaintiff's name(s), address(es), and telephone no(s).
Blue Cross Blue Shield of Michigan
600 E Lafayette Blvd
Detroit, MI 48226

v

Defendant's name(s), address(es), and telephone no(s).
Corizon Health Incorporated
c/o The Corporation Company
40600 Ann Arbor Road E Suite 201
Plymouth, MI 48170

Plaintiff's attorney, bar no., address, and telephone no.
Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
One Woodward Avenue, Suite 2400 Detroit, MI 48226
313-965-7848

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.   | SUMMONS |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>JUN 1 4 2022 | Expiration date*<br>SEP 1 3 2022 | Court clerk<br>Anthony Forlini |
|---|---|---|

ANTHONY G. FORLINI

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (9/19)   **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

SUMMONS

Case No. 22- 002 72 -CB

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature _____ |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | **TOTAL FEE** $ | Name (type or print) _____ |

Title _____

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                        Date

My commission expires: _____   Signature: _____
                          Date                        Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                    Attachments

_____ on _____
                      Day, date, time

_____ on behalf of _____
Signature

STATE OF MICHIGAN

IN THE MACOMB COUNTY CIRCUIT COURT

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

     Plaintiff,

v

CORIZON HEALTH INCORPORATED,

     Defendant.

Case No.: 2022- 002172 -CB

RICHARD L. CARETTI

_____ /

Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
Attorneys for Plaintiff
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
(313) 965-7848
gabe.sybesma@kitch.com
paul.wilk@kitch.com

_____ /

**RECEIVED**

JUN 1 4 2022

ANTHONY G. FORLINI
Macomb County Clerk

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AT LAW
One Woodward Avenue
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

## **COMPLAINT**

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.   MCR 2.113(C)(2)(b).

_(P83691)_

This Case meets the statutory requirements to be assigned to the Business Court pursuant to MCL 600.8031(C) and MCL 600.8035.

_(P83691)_

NOW COMES BLUE CROSS BLUE SHIELD OF MICHIGAN ("Plaintiff") and for its Complaint against Defendant CORIZON HEALTH INCORPORATED ("Defendant") states as follows:

## **GENERAL ALLEGATIONS**

1. Plaintiff Blue Cross Blue Shield of Michigan ("BCBSM") is a nonprofit mutual insurance company headquartered at 600 East Lafayette Boulevard, Detroit, Michigan 48226.

2. Defendant, Corizon Health Incorporated, is a prison healthcare contractor in the United States that provides services nationwide.

3. Defendant, Corizon Health Incorporated, has an office in Lansing, Michigan and contracted with the State of Michigan to provide healthcare services at over 30 facilities across the State.

4. Specifically, Corizon Health Incorporated provided healthcare services at the Michigan Department of Corrections facility located in Macomb County, Michigan.

5. Therefore, Defendant conducted business in Macomb County Michigan and Venue is proper pursuant to MCL 600.1621.

6. This Court has jurisdiction over this matter as the amount in controversy exceeds $25,000.00.

## **FACTUAL BACKGROUND**

7. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

2

8. In December of 2015, Plaintiff and Defendant signed an administrative services contract ("The Contract"), in which Plaintiff processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Defendant.[1]

9. Both parties performed under this contract until September of 2021.

10. On September 29, 2021, Defendant terminated The Contract.

11. However, pursuant to the terms of The Contract, Defendant is responsible for reimbursing Plaintiff for all claims incurred prior to September 29, 2021, which is the date the termination became effective.

12. Plaintiff sent an Invoice to Defendant detailing the amount owed, which totals $3,410,136.51.[2]

13. As of early 2022, Defendant had yet to make any payments towards the amount owed.

14. Plaintiff mailed a demand letter to Defendant in March of 2022 detailing the amount due and owing.[3]

15. Defendant did not respond to this letter and did not object to the amount owed.

16. As of the date of this Complaint, Defendant has not made any payment towards the overdue balance.

17. Defendant is in breach of the contract it entered into with Plaintiff and currently owes Plaintiff $3,410,136.51, in addition to interest, costs, and attorney fees, as a result of said breach.

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue
Suite 2400
Detroit, Michigan
48226-3484

(313) 965-7900

---

[1] **Exhibit A**- Contract
[2] **Exhibit B**- Invoice
[3] **Exhibit C**- Demand Letter

## COUNT I: BREACH OF CONTRACT

18. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.

19. A valid and enforceable contract exists between Plaintiff and Defendant, created in December of 2015.[4] This contract was renewed yearly, most recently in December of 2020.[5]

20. Plaintiff complied with all of its obligations under The Contract by processing medical claims submitted by Corizon on behalf of incarcerated individuals.

21. Defendant breached The Contract by failing to make payments for all claims processed prior to September 29, 2021, which was the date that Defendant terminated The Contract.

22. The breach by Defendant has caused damages to Plaintiff in the amount of $3,410,136.51, as well as interest, costs, and attorney fees.

WHEREFORE, Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court enter judgment in its favor and against Defendant, in addition to pre-suit and pre-judgment interest, costs, and attorneys' fees.

## COUNT II: ACCOUNT STATED

23. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue
Suite 2400
Detroit, Michigan
48226-3485

(313) 965-7900

[4] **Ex. A**
[5] **Exhibit D**- Group Signature Page

24. Defendant entered into a valid and enforceable contract promising to reimburse in return for Plaintiff processing medical claims for incarcerated individuals at Michigan correctional facilities serviced by Defendant.

25. Plaintiff sent Defendant statements outlining the claims processed by Plaintiff and the amount owed to Plaintiff by Defendant.[6]

26. Defendant received the demand letter and never objected to the stated amount owed.

27. Defendant has not paid the balance owed on the account, despite Plaintiff's demand for payment.

28. Defendant is justly indebted to Plaintiff in the amount of $3,410,136.51 plus interest, costs, and attorneys' fees.

29. An Affidavit verifying the balance due on the account is attached as **Exhibit E**.

WHEREFORE, Plaintiff Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court enter judgment in its favor and against Defendant, in addition to pre-suit and pre-judgment interest, costs, and attorneys' fees.

## **COUNT III: QUANTUM MERUIT**

30. Plaintiff restates the allegations contained in the above Paragraphs as if fully set forth herein.

31. Plaintiff processed medical claims submitted by Defendant based upon Defendant's promise to pay Plaintiff the agreed-upon amount.

32. Defendant received benefits from the work performed by Plaintiff.

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AT LAW
ONE WOODWARD AVENUE
SUITE 2400
DETROIT, MICHIGAN
48226-5485

(313) 965-7900

---

[6] **Ex. C**

DET02:2554611.1

33. As a result of Defendant's failure and refusal to pay the agreed-upon amount, Defendant has been unjustly enriched.

34. As a result of Defendant's failure and refusal to pay the agreed-upon amount, Plaintiff has sustained damages of at least $3,410,136.51, plus interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff Blue Cross Blue Shield of Michigan respectfully requests that this Honorable Court enter judgment in its favor and against Defendant, in addition to pre-suit and pre-judgment interest, costs, and attorneys' fees.

Respectfully submitted,

KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

By: _____
Gabe Sybesma (P66632)
Paul Wilk Jr (P83691)
Attorneys for Plaintiff
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
(313) 965-7848

Dated: June 14, 2022

Kitch Drutchas
Wagner Valitutti &
Sherbrook
ATTORNEYS AND
COUNSELORS
One Woodward Avenue
Suite 2400
Detroit, Michigan
48226-5485

(313) 965-7900

# EXHIBIT E

## <u>AFFIDAVIT OF YVONNE JOHNSON</u>

State of Michigan    )
                         ) ss
County of Wayne    )

I, Yvonne Johnson, after being first duly sworn, say as follows:

1. I have attained the age of eighteen, I am competent to testify to the facts set forth herein, and make this Affidavit upon my personal knowledge and/or upon review of the records of the business.

2. I am a Client Engagement Manager for Blue Cross Blue Shield of Michigan.

3. In December of 2015, Blue Cross Blue Shield of Michigan ("BCBSM") and Corizon Health Inc. ("Corizon") were parties to an administrative services contract ("the contract"), in which BCBSM processed medical claims for incarcerated individuals at Michigan correctional facilities serviced by Corizon.

4. BCBSM performed the agreed-upon services and processed all medical claims pursuant to the contract.

5. On September 30, 2021, Corizon terminated the contract between the parties.

6. Pursuant to the terms of the contract, Corizon is responsible for reimbursing BCBSM for all claims incurred prior to September 30, 2021 and BCBSM sent invoices to Corizon detailing the amounts owed.

7. BCBSM sent multiple invoices to Corizon detailing the amounts owed. Corizon ignored all of these invoices.

8. BCBSM sent Corizon a demand letter in March of 2022, regarding the overdue balance and attached the invoice to this demand letter.

9. Corizon has not objected to the statements sent by BCBSM seeking payment for the agreed-upon services rendered by BCBSM.

10. As of the date of this document, Corizon has not made any payments and is justly indebted to BCBSM in the amount of $3,410,136.51, over and above all legal setoffs and counter-claims. **(Exhibit A)**

## AFFIDAVIT OF YVONNE JOHNSON

11. The statement of account attached is true and correct.

Dated: _____

*Yvonne Johnson*

Subscribed and sworn to before me
This 9 TH day of JUNE , 2022

Notary Public
WAYNE County, MI
My Commission Expires: 4 - 9 - 23

**MARTIN F PARODY**
**Notary Public, Wayne County, MI**
**My Commission Expires: April 9, 2023**
**Acting in the County of** WAYNE

# EXHIBIT A

(AFFIDAVIT EXHIBIT A)



**Blue Cross
Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

| | | | |
|---|---|---|---|
| **Group Name** | CORIZON HEALTH, INC. | **Invoice Due Date** | 05/01/2022 |
| **Group Number** | 000071499 | **Invoice Date** | 04/12/2022 |
| **Invoice Number** | 141444768 | **Invoice Type** | MONTHLY INVOICED |
| **Total Balance Due** | $3,410,136.51 | **Bill Period** | 03/01/2022-03/31/2022 |

### Previous Invoice Summary

| | |
|---|---|
| Previous Balance | $3,376,244.91 |
| Balance Forward | $3,376,244.91 |

### Claim Summary

| Utilization Summary | Unit | Current Charges |
|---|---|---|
| Facility - Cases | 44 | $1,225.70CR |
| Professional - Clm | 115 | $35,024.65 |

### Taxes and Fees Summary

| Fee Type | Rate | Unit | Total |
|---|---|---|---|
| BCBSM PAYMENT INTEGRITY SHARE/ADMIN COMP | | | $92.65 |
| ADVANCE DEPOSIT | | | $0.00 |

### Total Charges Summary

| | |
|---|---|
| Total Current Charges | $33,891.60 |
| Total Balance Due | $3,410,136.51 |

Non-payment of this bill will result in cancellation of this policy retroactive to the last date for which full payment was made.

If there are questions concerning this invoice, contact Group Customer Inquiry and Billing Dept.
Phone: 1-800-446-5251   Email: ascbilling@bcbsm.com

Payment Options:
Wire Payment



**Blue Cross**
**Blue Shield**
of Michigan

A nonprofit corporation and independent licensee
of the Blue Cross and Blue Shield Association

ACH Payment
eBilling Application
Mail your regular or overnight payment to:

Blue Cross Blue Shield of Michigan
600 Lafayette E. Mail Code 1002
ATTENTION: ASC BILLING
Detroit, Michigan 48226

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**BLUE CROSS BLUE SHIELD OF MICHIGAN,**

       **Plaintiff,**

**v.**

**CORIZON HEALTH, INC.,**

       **Defendant.**

**Case No. 22-cv-11598**

**Removed from the Circuit Court of Macomb County, Michigan**
**Case No. 2022-002172-CB**

---

## DEFENDANT'S ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES

---

Defendant Corizon Health, Inc. ("Corizon"), by and through their undersigned attorneys, hereby answers Plaintiff's Complaint as follows.

## <u>GENERAL ALLEGATIONS</u>

1.    Corizon admits the allegations set forth in Paragraph 1 of the Complaint on information and belief.

2.    Corizon admits the allegations set forth in Paragraph 2, with the clarification that Corizon does not provide services in every state and is not interpreting "nationwide" in such a manner.

3.    As to the allegations set forth in Paragraph 3, Corizon admits only that it contracted with the State of Michigan to provide healthcare services at numerous facilities across the State.  However, Corizon denies as untrue that it presently has

an office in Lansing, Michigan.

4.    Corizon admits the allegations set forth in Paragraph 4.

5.    As to the allegations set forth in Paragraph 5, Corizon admits only that it conducted business in Macomb County, Michigan.  However, Corizon contests venue being proper in the Macomb County Circuit Court because the action has been properly removed to this Court.  Corizon does not contest venue in this Court.

6.    As to the allegations set forth in Paragraph 5, Corizon admits only that the amount in controversy exceeds $25,000.00.  However, Corizon contests jurisdiction in the Macomb County Circuit Court because the action has been properly removed to this Court.  Corizon does not contest jurisdiction in this Court.

## FACTUAL BACKGROUND

7.    Corizon restates its responses in the allegations of Paragraphs 1–6.

8.    Corizon admits the allegations set forth in Paragraph 8.

9.    Corizon neither admits nor denies the allegations of Paragraph 9 because it lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

10.    Corizon admits the allegations set forth in Paragraph 10.

11.    As to the allegations set forth in Paragraph 11, Corizon admits only that the Contract requires it to reimburse Plaintiff for all valid claims incurred prior to September 29, 2021, but demands strict proof of the validity of the claims submitted

and, as such, neither admits nor denies those allegations because it lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

12.  Corizon admits the allegations set forth in Paragraph 12 as they are stated, but denies as untrue that the amount of the invoice is actually owed.

13.  Corizon denies as untrue the allegations set forth in Paragraph 13. The allegation as written is not limited to the amount of the invoice attached as Exhibit B, and Corizon has made payments toward other amounts. Further, Corizon denies as untrue that the amount shown on the invoice attached as Exhibit B is actually owed.

14.  As to the allegations set forth in Paragraph 14, Corizon admits only that Plaintiff mailed a demand letter to Defendant dated March 18, 2022 demanding payment of the amount shown on the invoice in Exhibit B. However, Corizon denies as untrue that the letter "detail[ed] the amount" demanded and denies as untrue that the amount was actually due and owing.

15.  Corizon denies as untrue the allegations set forth in Paragraph 15.

16.  Corizon denies as untrue the allegations set forth in Paragraph 16. The allegation as written is not limited to the amount of the invoice attached as Exhibit B, and Corizon has made payments toward other amounts. Further, Corizon denies as untrue that the amount shown on the invoice attached as Exhibit B is actually owed or overdue.

17.    Corizon denies as untrue the allegations set forth in Paragraph 17.

## Count I

18.    Corizon restates its responses to the allegations of the above paragraphs as if fully set forth herein.

19.    Corizon admits the allegations set forth in Paragraph 19.

20.    Corizon neither admits nor denies the allegations of Paragraph 20 because it lacks knowledge or information sufficient to for a belief as to the truth of such allegations.

21.    Corizon denies as untrue the allegations set forth in Paragraph 21.

22.    Corizon denies as untrue the allegations set forth in Paragraph 22.

## Count II

23.    Corizon restates its responses to the allegations of the above paragraphs as if fully set forth herein.

24.    Corizon admits the allegations set forth in Paragraph 24, subject to the clarification that there were requirements set forth in the Contract for reimbursement to be made.

25.    Corizon admits the allegations set forth in Paragraph 25.

26.    Corizon denies as untrue the allegations set forth in Paragraph 26.

27.    Corizon denies as untrue the allegations set forth in Paragraph 27 on the basis that the amount demanded is not owed.

28.     Corizon denies as untrue the allegations set forth in Paragraph 28.

29.     Corizon admits only that an affidavit purporting to verify the balance due is attached to the Complaint as Exhibit E, but denies as untrue that the amount is actually due.

## **Count III**

30.     Corizon restates its responses to the allegations of the above paragraphs as if fully set forth herein.

31.     Corizon admits the allegations set forth in Paragraph 31 upon information and belief, subject to the clarification that there were requirements set forth in the Contract for reimbursement to be made.

32.     Corizon admits the allegations set forth in Paragraph 32 as stated, with the clarification that the benefits provided were not in the amount of payment demanded.

33.     Corizon denies as untrue the allegations set forth in Paragraph 33.

34.     Corizon denies as untrue the allegations set forth in Paragraph 34.

35.     Corizon denies all allegations not specifically admitted herein.

36.     Corizon denies that Plaintiff is entitled to the relief set forth in any of the unnumbered clauses beginning with the word "WHEREFORE." Corizon specifically notes that Plaintiff cites no basis for its demand for attorneys' fees, and the contract at issue contains no fee-shifting provision as to litigation between the

parties.

## AFFIRMATIVE DEFENSES

Defendant incorporates by reference in each Affirmative Defense set forth below the admission and denials of the above paragraphs of this Answer as if fully set forth herein.

### FIRST AFFIRMATIVE DEFENSE

Counts II and III fail to state a claim upon which relief may be granted because there is a valid contract in this matter that supersedes any quasi-contract claim for relief and the claims are not expressly pled in the alternative.

### SECOND AFFIRMATIVE DEFENSE

Defendant did not engage in any unlawful, wrongful, negligent, fraudulent, or malicious conduct against Plaintiff, is not liable to Plaintiff, and Plaintiff is not entitled to any relief or damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its own prior material breach of the contract between the parties, which excused further performance by Corizon.

**WHEREFORE**, Defendant prays for judgment in its favor and against Plaintiff and that the Court dismiss Plaintiff's Complaint against Defendants and grant such other relief as the Court deems proper and just.

BUTZEL LONG,

Respectfully submitted,

By: */s/ Phillip C. Korovisis*
    Phillip C. Korovisis (P40579)
150 W. Jefferson, Ste. 100
Detroit, Michigan 48226
(313) 225-7000
korovesis@butzel.com
Counsel for Defendant

Date: July 20, 2022

Russell B. Morgan (TN Bar No. 20218)
*(pro hac vice admission to be requested)*
BRADLEY ARANT BOULT CUMMINGS LLP
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, TN 37203
615.252.2311 (phone)
615.252.6311 (fax)
rmorgan@bradley.com
Counsel for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2022, a copy of the foregoing was filed electronically with the Clerk's office by using the CM/ECF system and served electronically and/or via first-class U.S. mail, postage prepaid, upon all counsel as indicated below. Parties may also access this filing through the Court's ECF system.

*/s/ Phillip C. Korovisis*
Phillip C. Korovesis (P40579)

# EXHIBIT G

# Exide Techs. v. Kmart Corp.

United States District Court for the Eastern District of Michigan, Southern Division

May 20, 2009, Decided; May 20, 2009, Filed

Case No. 07-CV-11269

**Reporter**
2009 U.S. Dist. LEXIS 42618 *; 2009 WL 1438729

EXIDE TECHNOLOGIES, Plaintiff, vs. KMART CORPORATION, Defendant.

**Subsequent History:** Reconsideration denied by Exide Techs. v. Kmart Corp., 2009 U.S. Dist. LEXIS 47931 ( E.D. Mich., June 8, 2009)

**Prior History:** Exide Techs. v. Kmart Corp., 2008 U.S. Dist. LEXIS 52412 ( E.D. Mich., July 9, 2008)

**Counsel:** [*1] For Exide Technologies, Plaintiff, Counter Defendant: Kevin T. Kennedy, LEAD ATTORNEY, Blake, Kirchner, Detroit, MI; Timothy P. Brady, LEAD ATTORNEY, Blake, Kirchner, Detroit, MI.

For Kmart Corporation, Defendant, Counter Claimant: Michael O. Fawaz, Michelle M. Wezner, Howard & Howard Attorneys PLLC, Royal Oak, MI; Patrick M. McCarthy, Howard & Howard, Ann Arbor, MI.

**Judges:** HON. GEORGE CARAM STEEH, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE CARAM STEEH

# Opinion

ORDER DENYING EXIDE'S MOTION FOR SUMMARY JUDGMENT (# 58) AND GRANTING, IN PART, KMART'S MOTION FOR SUMMARY JUDGMENT (# 57)

Plaintiff Exide Technologies and defendant Kmart Corporation each move for summary judgment of Exide's claims of breach of contract, quantum meruit, account stated, and unjust enrichment, as well as Kmart's counterclaim seeking declaratory relief that Kmart was contractually entitled to receive invoice credits from Exide. A hearing on the cross-motions was held on January 22, 2009.

I.

Exide filed a First Amended Complaint on March 27, 2007 alleging Kmart improperly deducted credits from Exide battery invoices in the amount of $ 473,840.68. Count I alleges breach of contract. Count II alleges quantum meruit. Count III alleges account [*2] stated. Count IV alleges unjust enrichment. Kmart filed a counterclaim on April 25, 2007 seeking declaratory relief that it properly received invoice credits in the amount now claimed by Exide.

The pleadings and record evidence show that Exide was Kmart's "exclusive suppler for lead-acid batteries" from March 5, 2002 through February 28, 2005 under a written "EXIDE / KMART BATTERY PROGRAM TERM SHEET" ("Agreement"). Under the Agreement, Kmart was "responsible for identifying and segregating store [battery] rotations" of "Automotive, Garden Tractor, [and] Marine Batteries" that were six to nine months old. For such qualifying batteries that were "rotated" by Kmart back to Exide, Kmart was entitled to receive a credit "equal to acquisition cost set forth on Schedule A attached [to the Agreement] in accordance with Kmart's 620 system." Batteries older than nine months were considered "junk" batteries for which Kmart was not entitled to receive a credit.

The Agreement continues that "No deductions may be taken by Kmart from invoiced amounts without Exide's prior approval." The Agreement further reads:

> . The parties hereby agree that the provisions of this Battery Program Term Sheet and in [*3] Schedule A attached hereto, and incorporated by reference herein, are the primary terms by which the parties hereto intend to be bound, and they cannot be altered or varied by any other terms or conditions contained in documentation exchanged between the parties hereto; except that, to the extent not inconsistent herewith, the terms and conditions of Kmart's Purchase Order, attached hereto as Exhibit B, will also apply.

In bold letters on the signature page, the Agreement reads: "THE TERMS AND CONDITIONS STATED IN

THIS BATTERY PROGRAM TERM SHEET AND IN SCHEDULES A AND B ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN, CONSTITUTE A LEGAL AND BINDING AGREEMENT BETWEEN THE PARTIES[.] . . . ." "SCHEDULE B KMART PURCHASE ORDER TERMS AND CONDITIONS" provides at paragraph 7:

**Deductions and Set Off**. Any sums payable to Vendor [Exide] are subject to all claims and defenses of Buyer [Kmart], whether arising from this or any other transaction, and Buyer [Kmart] may set off and deduct against any such sums all present and future indebtedness of Vendor [Exide] to Buyer [Kmart]. Buyer [Kmart] will provide a copy of the deduction voucher(s) for debits taken by Buyer [Kmart] against Vendor's [Exide's] **[*4]** account as a result of any returns or adjustments. Vendor [Exide] accepts and agrees to each such deduction unless Vendor [Exide], within 90 days after receipt of the deduction voucher, notifies Buyer [Kmart] in writing as to why a deduction should not be made and provides documentation of the reason(s) given. Such written notice must be directed to Buyer's [Kmart's] Vendor Audit Department at the above address. Buyer [Kmart] is not liable for any interest or late charges.

As the Agreement neared its March 2005 end, Exide Credit Analyst Glinda Elder compiled a 123-page computer-generated spreadsheet ("Spreadsheet") identifying in separate data fields: Kmart check numbers and check dates from which Kmart deducted invoice credits for rotated batteries; the amount of each credit taken by Kmart; the Kmart store number from which the batteries were returned; the invoice dates from which credits were taken; and an identifying "error code" assigned by Elder. The fifteen numerical "error codes" and corresponding descriptions as defined by Elder include: "1 - No Credit - Junks"; "8 - Need Paperwork"; and "9 - Legal Activity No Support for Deduction." From this Spreadsheet, Elder prepared a March **[*5]** 1, 2005 "Chargeback Debit Invoice" in the amount of $ 747,249.38, titled "Invalid Rotation Deductions-No Proof of Pick-Up." On March 1, 2005, Exide sent Kmart the Chargeback Debit Invoice, the Spreadsheet, and a letter demanding full payment of the $ 747,249.38. Exide filed this lawsuit on March 23, 2007.

In practice, Kmart "620 Clerks" identified in "620 Forms" the credit-qualifying batteries to be shipped and rotated back to Exide. Based on these 620 Form inputs, Kmart deducted credits from Exide battery invoices. Exide maintains that deductions could not be changed once the 620 Clerks input the information into Kmart's "620 computer software." According to Kmart, 620 Form inputs were subject to revision until finalized at the end of each day.

Kmart instructed its shipping floor personnel to separate non-credit "junk" batteries from credit-qualifying batteries, and to place the different batteries on separate pallets for shipment back to Exide. Exide proffers evidence that Kmart shrink-wrapped credit-qualifying and junk batteries together on the same pallet, making it impossible for Exide drivers picking up the batteries to determine whether they were junk or credit-eligible. Kmart **[*6]** proffers evidence that "620 shipping labels" were affixed to the pallets, identifying the credit-eligible batteries.

The record also demonstrates that Exide-authorized drivers completed a "Delivery Exception Report," or "DER," when picking up rotated batteries from Kmart locations. Drivers left copies of completed DERs at the Kmart stores before returning the batteries to Exide. Kmart proffers evidence that the DER noted the number of batteries being returned by Kmart for credit. Once rotated batteries were received by Exide, they were "keyed-in" to Exide's computer system to identify those batteries that did not qualify for invoice credit i.e. batteries that were greater than nine months old. Exide asserts that "[d]uring the initial days of the Battery Program, when an improper deduction was identified by Exide, its Credit Analyst (Glinda Elder) would contact her counterpart at Kmart (Jill Butterfield), and Kmart would repay the improper deduction. However, as the contract expired and was not renewed, Kmart repaid fewer and fewer improper deductions." Exide's October 20, 2008 Motion for Summary Judgment, at 5 (citing Elder's April 23, 2008 deposition testimony, at 9; Butterfield's **[*7]** Supervisor Catherine Jump's April 29, 2008 deposition testimony, at 65-67; and a March 24, 2005 e-mail from Kmart's Steve Partio to Jill Butterfield).

Exide claims damages as of July 8, 2008 of $ 643,720.15 in credits Kmart allegedly received over the course of the contract for non-qualifying batteries. Exide admits it is not entitled to $ 107,707.71 for claims dating prior to April 23, 2003, the date Kmart's bankruptcy plan was approved.

II.

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and

2009 U.S. Dist. LEXIS 42618, *7

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). **[*8]** The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the nonmoving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

A. Breach of Contract

i.

Kmart argues that the Agreement expressly incorporates the Schedule B Purchase Order, which deems Exide's acceptance of Kmart invoice deductions unless Exide notifies Kmart in writing **[*9]** within 90 days after receiving a "deduction voucher" why Exide believes the deduction should not be approved "and provides documentation for the reason(s) given." Kmart asserts that Exide's instant claims are therefore limited to approximately $ 60,740.00 in invoice deductions taken by Kmart on and after December 1, 2004, being 90 days prior to Kmart's receipt of Exide's March 1, 2005 demand letter and Spreadsheet.

Exide counters that this 90-day limitation period is expressly inapplicable because it is "inconsistent" with that part of the Agreement stating that "[n]o deductions

may be taken by Kmart from invoiced amounts without Exide's prior approval." Exide continues that the Kmart Purchase Order term "deduction voucher" is otherwise undefined within the Agreement, and could not reasonably be interpreted to mean a completed 620 Form or DER.

The parties do not dispute that Michigan law is controlling. The court will apply Michigan law. See Wonderland Shopping Center Venture Ltd. Partnership v. CDC Mortgage Capital, Inc., 274 F.3d 1085, 1092 (6th Cir. 2001); Equitable Life Assurance Society of the United States v. Poe, 143 F.3d 1013, 1016 (6th Cir. 1998); Chrysler Corporation v. Skyline Indus. Servs., Inc., 448 Mich. 113, 120, 120 n.14, 125, 528 N.W.2d 698 (1995). **[*10]** In Michigan, as elsewhere, a court's obligation in interpreting a written contract is to discern the contracting parties' intent. Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citing Sobczak v. Kotwicki, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)). This intent is to be determined in light of the surrounding circumstances and from a reading of the instrument as a whole. Cleveland v. Detroit Trust Co., 264 Mich. 253, 257, 249 N.W.2d 842 (1933). If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy. Quality Products, 469 Mich. at 375 (citing Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel, 460 Mich. 558, 570, 596 N.W.2d 915 (1999)); Port Huron Ed. Ass'n v. Port Huron Area School Dist., 452 Mich. 309, 323, 550 N.W.2d 228 (1996) (citing Dykema v. Muskegon Piston Ring Co., 348 Mich. 129, 138, 82 N.W.2d 467 (1957)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." UAW-GM Human Resource Center v. KSL Recreation Corp., 228 Mich. App. 486, 491-492, 579 N.W.2d 411 (1998) **[*11]** (quoting Dillon v. DeNooyer Chevrolet Geo, 217 Mich. App. 163, 166, 550 N.W.2d 846 (1996)).

Extrinsic evidence may be used to dispose of a potential contractual ambiguity. Wonderland Shopping Center, 274 F.3d at 1095 (citing Am. Anodco, Inc. v. Reynolds Metals Co., 743 F.2d 417, 422 (6th Cir. 1984)). With respect to a sale of goods in Michigan, the UCC provides:

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in

without objection shall be relevant to determine the meaning of the agreement.
(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade [M.C.L. § 440.1205].

M.C.L. §440.2208(1-2). "A course of dealing is a sequence of previous conduct between the parties to a particular transaction **[*12]** which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." M.C.L. § 440.1205(1).

The written Agreement read as whole, expressly incorporating the terms of the Kmart Schedule B Purchase Order, clearly conveys the intent that Kmart was responsible for first identifying and segregating its Exide batteries eligible for invoice credits using the Kmart 620 computer system, that Kmart was required to provide Exide with a "deduction voucher" representing the invoice credits taken against Exide's account as a result of any returned batteries, and that Exide agreed and accepted any such deductions unless Exide notified Kmart in writing within 90 days why Exide believed the deduction should not be made. Quality Products, 469 Mich. at 375; Detroit Trust Co., 264 Mich. at 257. This unambiguous contractual intent is "not inconsistent" with Exide's right of "prior approval" over invoice deductions taken by Kmart. Giving the contract language its plain and ordinary meaning, the Agreement simply provides that Exide's contractual right of prior approval had to be exercised within 90 days after receiving a "deduction voucher" from **[*13]** Kmart, or else the deduction would be deemed approved. Detroit Trust Co., 264 Mich. at 257.

Extrinsic evidence, including the parties' repeated performance of the Agreement, supports the court's interpretation of the written contract. Wonderland Shopping Center, 274 F.3d at 1095; M.C.L. § 440.2208(1). It is beyond dispute that Kmart invoice deductions were first submitted in writing to Exide, and were *thereafter* subject to approval by Exide after Exide reviewed its DERs and its own computer inputs. As conceded by Exide in its brief, "when an improper deduction *was identified by Exide*, its Credit Analyst (Glinda Elder) would contact her counterpart at Kmart

(Jill Butterfield), and Kmart would repay the improper deduction." Exide's October 2008 Motion for Summary Judgment, at 5 (emphasis added). Exide could only identify a deduction as "improper" after Kmart submitted the deduction. Over the course of the contract, Exide processed Kmart invoice deductions without objection to their form. M.C.L. § 440.2208(1). Exide's argument that use of the term "deduction voucher" rendered the language of the Kmart Schedule B Purchase Order ambiguous is not well taken. Exide readily identified Kmart **[*14]** invoice deductions by date and amount in the proffered Spreadsheet. See Exide's Exhibit T.

Kmart's argument that its invoice deductions were "accepted" by Exide when an Exide-driver completed a DER at a Kmart store is not supported by the record. Once again, the parties' course of performance illustrates that Kmart recognized Exide Credit Analyst Elder's right to challenge Kmart invoice deductions well after a DER had been completed and Kmart's ability to modify a System 620 input had expired. Exide input battery numbers into its own computer system for verification after the shrink-wrapped batteries were received from Kmart. Consistent with the language of the Agreement as supported by the extrinsic evidence and parties' course of performance, Exide had 90 days to review the invoice deductions it received from Kmart, and if Exide did not object in writing within those 90 days, the deductions were deemed accepted by Exide. Construing the Agreement as a matter of law, Exide's breach of contract claims are limited to Kmart invoice deductions received by Exide on or after December 1, 2004 [1] as identified in writing by Exide in the March 1, 2005 Spreadsheet. Quality Products, 469 Mich. at 375. **[*15]** Kmart's motion for summary judgment will be granted, in part, to the extent Exide alleges Kmart committed a breach of contract prior to December 1, 2004. Amway Distributors, 323 F.3d at 390.

ii.

Kmart argues that Exide's written documentation for

---

[1] The court need not reach the argument advanced by Kmart that Exide is equitably estopped by the "mend the mold doctrine," or otherwise, from denying its acceptance of Kmart invoice credit deductions submitted before December 1, 2004. The issue is controlled by contract law. Exide is not equitably estopped from demonstrating that, consistent with the Agreement's 90 day acceptance period and the submission of its March 1, 2005 letter and Spreadsheet to Kmart, Exide did not accept the invoice deductions submitted by Kmart on or after December 1, 2004.

challenging $ 60,740.53 in invoice deductions submitted by Kmart on and after December 1, 2004 garners, at best, only $ 41,606.81 in damages. Exide responds that Kmart destroyed Kmart's copies of the 620 Forms and DERs, and therefore Exide is entitled to an evidentiary presumption that it could support all of its claims, shifting the burden upon Kmart to prove that its invoice deductions were valid.

As **[*16]** the party alleging the breach of contract claim, Exide bears the burden of proving it suffered damages as the result of Kmart's breach of contract. <u>Alan Custom Homes, Inc. v. Krol</u>, 256 Mich. App. 505, 512, 667 N.W.2d 379 (2003).

> [I]n a case involving the failure of a party to preserve evidence, a trial court properly exercises its discretion when it carefully fashions a sanction that denies the party the fruits of the party's misconduct, but that does not interfere with the party's right to produce other relevant evidence. An appropriate sanction may be the exclusion of evidence that unfairly prejudices the other party or an instruction to the jury that it may draw an inference adverse to the culpable party from the absence of the evidence.

<u>MASB-SEG Property/Casualty Pool, Inc. v. Metalux</u>, 231 Mich. App. 393, 400, 586 N.W.2d 549 (1998) (quoting <u>Brenner v. Kolk</u>, 226 Mich. App. 149, 161, 573 N.W.2d 65 (1998)). The appropriateness of a particular sanction lies within the trial court's discretion. <u>Id.</u> at 401.

Exide at one time possessed both its DERs and copies of Kmart's invoice deductions. Under the parties' contract, Exide bears the burden of producing timely "documentation of the reason(s) **[*17]** given" by Exide why an invoice deduction should not be made. Exide Credit Analyst Elder retained enough information to identify Kmart check numbers and dates from which invoice deductions were taken, the amount of each credit taken, and an identifying "error code" giving a reason why the deduction should not have been approved. <u>See</u> Exide's Exhibit T. Exide had its own computer system for crosschecking Kmart's invoice deductions. Under the totality of the circumstances, it would be inappropriate to shift the burden of proof to defendant Kmart to *disprove* Exide's breach of contract claims because Kmart did not save copies of its 620 Forms. <u>Alan Custom Homes, Inc. v. Krol</u>, 256 Mich. App. at 512; <u>Metalux</u>, 231 Mich. App. at 400.

Construing the pleadings and evidence in a light most favorable to Exide, a genuine factual dispute remains regarding the amount of damages, if any, suffered by Exide as the result of alleged breaches of contract committed by Kmart on and after December 1, 2004, and as identified in Exide's March 1, 2005 Spreadsheet. Kmart's and Exide's motions for summary judgment as to these breach of contract claims will be denied. <u>Amway Distributors</u>, 323 F.3d at 390.

**B. Quantum [*18] Meruit and Unjust Enrichment**

"The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment." <u>Morris Pumps v. Centerline Piping, Inc.</u>, 273 Mich. App. 187, 194, 729 N.W.2d 898 (2007). "However, a contract will be implied only if there is no express contract covering the same subject matter." <u>Id.</u> (quoting <u>Belle Isle Grill Corp. v. Detroit</u>, 256 Mich. App. 463, 478, 666 N.W.2d 271 (2003)). "Generally, an implied contract may not be found if there is an express contract between the same parties on the same subject matter." <u>Id.</u> (quoting 42 CJS Implied and Constructive Contracts, § 34, p. 33) (emphasis omitted). Exide's claims of quantum meruit and unjust enrichment seek recovery on the same subject matter as the parties' express Agreement. Accordingly, Kmart is entitled to summary judgment of Exide's quantum meruit and unjust enrichment claims as a matter of law. <u>Morris Pumps</u>, 273 Mich. App. at 193-94; <u>Amway Distributors</u>, 323 F.3d at 390.

**C. Account Stated**

"The conversion of an open account into an account stated, is an operation by which the parties assent to a sum as the correct balance due from one to the other[.]" <u>Kaunitz v. Wheeler</u>, 344 Mich. 181, 185, 73 N.W.2d 263 (1955). **[*19]** "[W]here a plaintiff is able to show that the mutual dealings which have occurred between two parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance." <u>Keywell and Rosenfeld v. Bithell</u>, 254 Mich. App. 300, 331, 657 N.W.2d 759 (2003) (quoting <u>Watkins v. Ford</u>, 69 Mich. 357, 361, 37 N.W. 300 (1888)). A prima facie account stated claim may be established by: (1) serving the defendant with an affidavit of the amount due pursuant to M.C.L. § 600.2145, accompanied by proof that the defendant failed to file a counter-affidavit denying the debt; or (2) "through evidence of an express understanding, or words and acts, and the necessary and proper inferences thereon." <u>Klochko Equipment Rental Co., Inc. v. Village Green Construction, L.L.C.</u>, No. 235599, 2003 Mich. App. LEXIS 1429, 2003 WL 21398305, at * 3 (Mich. Ct. App. June 17, 2003) (citing <u>Keywell</u>, 254 Mich. App. at 331).

Exide did not serve Kmart with a statutory affidavit pursuant to M.C.L. § 600.2145. Exide has not come forward with evidence that would allow a reasonable jury to find or infer that Kmart ever agreed with Exide that Kmart owed $ 747,249.38 as set forth in the March 1, 2005 Chargeback Debit Invoice and **[*20]** Spreadsheet, or $ 473,840.68 as alleged in the First Amended Complaint. Exide provided Kmart with the Chargeback Debit Invoice and Spreadsheet one day after the Agreement ended on February 28, 2005. These circumstances are unlike those in Wilson v. White, 223 Mich. 497, 500, 509-10, 194 N.W. 593 (1923), where the defendants failed to object to the plaintiffs' billing practices over the course of a 15-year business relationship, and objected only to the accounting methods after the plaintiffs filed a lawsuit. Kmart's failure to "object" to the March 1, 2005 Chargeback Debit Invoice before Exide filed suit on March 23, 2007 does not support a finding that Kmart agreed with Exide that the alleged debt was the correct amount due. Kmart is entitled to summary judgment of Exide's account stated claim as a matter of law. Amway Distributors, 323 F.3d at 390.

D. Kmart's Counterclaim

Kmart's counterclaim seeks a declaration that Kmart was entitled to receive credits or deductions under the Agreement "at least in an amount of $ 473,840.68, or such other amount as may be proven at trial." The counterclaim is moot to the extent Exide seeks to recover invoice credit deductions taken by Kmart prior **[*21]** to December 1, 2004. Whether Kmart was contractually entitled to the invoice credit deductions it took on or after December 1, 2004 remains at issue. The parties cross-motions for summary judgment of Kmart's counterclaim will be denied.

III.

Exide's motion for summary judgment is hereby DENIED. Kmart's motion for summary judgment is hereby GRANTED, IN PART, as to Exide's claims of quantum meruit, account stated, and unjust enrichment, and to the extent Exide alleges Kmart committed a breach of contract prior to December 1, 2004. Exide's claims of quantum meruit as alleged in Count II, account stated as alleged in Count III, and unjust enrichment as alleged in Count IV are hereby DISMISSED with prejudice. Exide breach of contract claim as alleged in Count I is hereby DISMISSED with prejudice, but ONLY to the extent Exide alleges Kmart committed a breach of contract prior to December 1, 2004. Exide's breach of contract claims remain viable ONLY to the extent Exide alleges Kmart committed a breach of contract on or after December 1, 2004. Kmart's counterclaim seeking declaratory relief is hereby DISMISSED as MOOT to the extent Kmart seeks a declaration that it was entitled to invoice credit **[*22]** deductions it took prior to December 1, 2004. Consistent with the reasoning set forth herein, this matter will proceed on Exide's remaining claim that Kmart breached the Agreement on or after December 1, 2004.

SO ORDERED.

Dated: May 20, 2009

/s/ George Caram Steeh

GEORGE CARAM STEEH

UNITED STATES DISTRICT JUDGE

---

**End of Document**

PAUL WILK JR

# EXHIBIT H

# KLOCHKO EQUIP. RENTAL CO. v. VILLAGE GREEN CONSTR.

Court of Appeals of Michigan

June 17, 2003, Decided

No. 235599

**Reporter**
2003 Mich. App. LEXIS 1429 *; 2003 WL 21398305

KLOCHKO EQUIPMENT RENTAL CO., INC., Plaintiff-Appellee, v VILLAGE GREEN CONSTRUCTION, L.L.C., d/b/a REGENTS PARK OF TROY, L.L.C., Defendant-Appellant.

**Notice:** **[\*1]** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** Oakland Circuit Court. LC No. 01-028470-CK.

**Disposition:** Affirmed.

**Judges:** Before: Griffin, P.J., and Murphy and Jansen, JJ.

# Opinion

PER CURIAM.

Defendant appeals as of right from the trial court's judgment granting plaintiff's motion for summary disposition pursuant to MCR 2.116(C)(10). Plaintiff had filed a complaint against defendant alleging causes of action predicated on breach of contract and "account stated" for excavation work it performed as a subcontractor with respect to the construction of an apartment complex. We affirm.

The first issue on appeal is whether the trial court's summary disposition ruling on plaintiff's breach of contract claim was improper because, according to defendant, there were genuine issues of material fact regarding the elements necessary to establish the claim. We disagree. This Court reviews de novo a trial court's decision on a summary disposition motion. *Maiden v Rozwood*, 461 Mich. 109, 118; 597 N.W.2d 817 (1999).

The trial court's ruling on plaintiff's breach **[\*2]** of contract claim was proper because there was no genuine issue of material fact on which reasonable minds could differ, and plaintiff was entitled to judgment as a matter of law.

In support of plaintiff's motion for summary disposition, plaintiff attached the affidavit of its vice president, Thomas Klochko, who asserted that plaintiff performed its work and submitted daily tickets indicating the equipment used, number of hours worked, and total cost in compliance with the terms of the contract. Klochko further asserted that, from June 2000 through September 2000, defendant signed each and every daily ticket that plaintiff submitted thereby approving plaintiff's work and billing, which totaled $ 241,100. Even though defendant signed and approved each daily ticket, it has only paid plaintiff approximately $ 105,656.

Klochko further asserted that, contrary to the contract's terms, defendant failed to issue a change order to cover the $ 105,868 balance on plaintiff's third payment application and failed to issue weekly change orders, instead choosing to issue monthly change orders. [1] According to Klochko, plaintiff repeatedly requested payment of the remaining contract balance, but **[\*3]** defendant has refused to pay it.

_____

[1] The record reflects that plaintiff made three payment applications for its work, the first two of which defendant paid except for a ten-percent retention amount, $ 11,739, that was not paid after completion of the entire project. The first payment application was based on the project price as reflected in the terms of the original contract without the need for any change orders. The second payment application was predicated on signed and approved daily tickets and a change order executed by defendant. In regards to the third payment application, plaintiff submitted a request for $ 123,704 based on signed and approved daily tickets for the entire amount. However, defendant executed a change order covering only $ 17,836 of that amount, which left a balance of $ 105,868 not covered by a change order. Defendant did not pay any of the billed amount of $ 123,704, which, when added to the retention amounts not paid, totaled $ 135,443, which amount is reflected in the judgment.

2003 Mich. App. LEXIS 1429, *3

In **[*4]** addition to providing Klochko's affidavit, plaintiff also submitted daily tickets signed by defendant's agent showing the performance of extra work from June 13, 2000 through September 1, 2000, totaling about $ 166,802. In addition to these "daily tickets," plaintiff submitted an application for payment that included $ 17,836 as an "excess soil and loader charge" for work it performed in late September. This amount, $ 17,836, is apparently covered by a change order that was executed by defendant. The original subcontract price of $ 56,462, together with the $ 166,802 owed for additional work performed through September 1, 2000, and the $ 17,836 excess soil and loader charge add up to a total contract price of $ 241,100.

Defendant argues that the total contract price, as reflected by the original contract price and the executed change orders, totaled $ 135,231, and that plaintiff's third application for payment requesting additional amounts is not reflected, as required, by an executed change order. We initially note with interest that defendant makes no claim that plaintiff did not complete the work for which plaintiff seeks recovery. The documentary evidence indicates that the work **[*5]** for which plaintiff seeks recovery was performed between August 4, 2000, and September 1, 2000. Plaintiff submitted daily tickets signed and approved by defendant with respect to the work performed between August 4 and September 1. Although no change order was submitted as to this work, the parties' contract provides that defendant "will issue change orders on a weekly basis to cover all approved amounts exceeding [the] contract amount." The record shows that the work was approved and completed; therefore, a change order should have been issued, and defendant cannot now claim that the lack of a change order negates plaintiff's claim.

Defendant failed to introduce any affidavits, depositions, or other documentary evidence necessary to create a factual dispute in regards to whether it approved of the extra work plaintiff performed. Defendant has not contradicted the daily tickets it signed approving charges for time and material. In a motion for summary disposition under MCR 2.116(C)(10), once the moving party offers evidence supporting the grounds for summary disposition, the adverse party must come forward with documentary evidence showing that a genuine issue of material fact exists **[*6]** for trial. *Quinto v Cross & Peters Co,* 451 Mich. 358, 362-363; 547 N.W.2d 314 (1996).

The only documentation defendant attached to its response to plaintiff's motion for summary disposition was the parties' agreement, an August 15, 2000, contractor's affidavit signed by plaintiff's project superintendent, and plaintiff's October 2000 payment application. None of these documents create a genuine issue of material fact regarding the $ 241,100 total contract price or regarding whether defendant approved of the extra work when it signed the daily tickets. The documents submitted by defendant are either taken out of context or simply do not contradict plaintiff's claims.

We also conclude that, contrary to defendant's argument on appeal, the fact that the change orders do not add up to the total contract price of $ 241,100 does not create an issue of fact as to whether defendant owed plaintiff a duty to pay for additional work performed. The prices listed in the change orders do not represent that total contract price because the change orders only cover payment for extra work beyond that specified under the original contract price.

Accordingly, we conclude **[*7]** that plaintiff established through documentary evidence the existence of a valid agreement between the parties and further presented documentary evidence establishing defendant's failure to perform its duty to pay the contract balance, which was not contradicted by evidence submitted by defendant. The trial court did not err in granting summary disposition to plaintiff.

Next, defendant argues that the trial court improperly granted plaintiff summary disposition on its "account stated" claim because plaintiff failed to provide prima facie evidence of indebtedness as required by MCL 600.2145. Again, according this issue de novo review, *Maiden, supra* at 118, we disagree.

An "account stated" is a balance struck between the parties on a settlement; and where a plaintiff is able to show that the mutual dealings which have occurred between the parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance. *Keywell & Rosenfeld v Bithell*, 254 Mich. App. 300, 331; 657 N.W.2d 759 (2002).

Under MCL 600.2145, when a plaintiff bringing an "account stated" **[*8]** claim makes an affidavit of the amount due and attaches to the affidavit a copy of the account and serves the defendant with the copy of the account, the affidavit, and the complaint, the affidavit "shall be deemed prima facie evidence of indebtedness, unless the defendant with his answer, by himself or agent, makes an affidavit and serves a copy thereof on the plaintiff or his attorney denying the [indebtedness]."

The statute's language does not mandate serving a defendant with a copy of the account and the affidavit when serving the complaint. Rather, it states that such action creates "prima facie evidence of indebtedness" absent an affidavit by the defendant denying the indebtedness.

Moreover, MCL 600.2145 is not the only way to establish a claim for account stated; such a claim can be proven through evidence of an express understanding, or words and acts, and the necessary and proper inferences thereon. *Keywell, supra* at 331. To establish a claim for account stated, a plaintiff must prove that the defendant expressly accepted bills tendered by paying them or failed to object to them within a reasonable time. *Id.*

Plaintiff **[*9]** established its "account stated" claim. The documentary evidence plaintiff submitted to the lower court indicated that defendant partially paid the bills that plaintiff submitted, and that defendant failed to object to any of the costs within a reasonable time. Plaintiff provided the court with the daily tickets that explained the extra work it provided and the charges incurred for the extra work during the period of June 13, 2000 through September 1, 2000. Each of those tickets was signed and approved by defendant's agent. Plaintiff also furnished the affidavit of Thomas Klochko, in further support.

Defendant has not come forward with documentary evidence establishing a genuine issue of material fact for trial.

Given the documentary evidence plaintiff submitted, and defendant's failure to submit an affidavit or other documentary evidence indicating that it objected to the amount owed within a reasonable time, the trial court properly concluded that plaintiff established its "account stated" claim and properly granted summary disposition based on its conclusion that no genuine issue of material fact existed for trial and that plaintiff was entitled to judgment as a matter of law.

**[*10]** Finally, defendant argues that the trial court's decision to grant plaintiff summary disposition pursuant to MCR 2.116(C)(10) was premature because no discovery was conducted. We disagree.

Generally, summary disposition is premature if a circuit court grants the motion before discovery on a disputed issue is complete. *Village of Dimondale v Grable*, 240 Mich. App. 553, 566; 618 N.W.2d 23 (2000), quoting *Dep't of Social Services v Aetna Casualty & Surety Co*,

177 Mich. App. 440, 446; 443 N.W.2d 420 (1989). Nevertheless, a court's decision to grant summary disposition before the completion of discovery may be proper "where further discovery does not stand a fair chance of uncovering factual support for the position of the party opposing the motion." *Prysak v R L Polk Co*, 193 Mich. App. 1, 11; 483 N.W.2d 629 (1992).

In addition, a party opposing summary disposition cannot simply state that summary disposition is premature without identifying a disputed issue and supporting that issue with independent evidence. *Hyde v Univ of Michigan Bd of Regents*, 226 Mich. App. 511, 519; **[*11]** 575 N.W.2d 36 (1997); *Pauley v Hall*, 124 Mich. App. 255, 263; 335 N.W.2d 197 (1983).

In *Pauley*, this Court stated as follows:

> This Court has held that a grant of summary judgment is premature if made before discovery on the disputed issue is complete. However, there must be a disputed issue before the court. If the party opposing a motion for summary judgment cannot present competent evidence of a disputed fact because his or her discovery is incomplete, the party must at least assert that such a dispute does indeed exist and support the allegation by some independent evidence, even if hearsay. An unsupported allegation which amounts solely to conjecture does not entitle a party to an extension of time for discovery, since under such circumstances discovery is nothing more than a fishing expedition to discover if any disputed material fact exists between the parties. [*Id.*(citations omitted).]

Here, defendant has failed to identify any disputed issue and has further failed to support its allegation that a dispute exists with independent evidence. Therefore, we find no merit to defendant's claim that the trial court's summary **[*12]** disposition ruling was premature. Affirmed.

/s/ Richard Allen Griffin
/s/ William B. Murphy
/s/ Kathleen Jansen

**End of Document**